PARAMOUNT CLOTHING CO., INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Paramount Clothing Co. v. Commissioner
Docket No. 11069-77.
United States Tax Court
T.C. Memo 1979-64; 1979 Tax Ct. Memo LEXIS 463; 38 T.C.M. (CCH) 261; T.C.M. (RIA) 79064; February 27, 1979, Filed Shale D. Stiller and Jerome D. Carr, for the petitioner. Charles B. Zuravin, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined deficiencies in petitioner's Federal income tax for the taxable years ended June 30, 1974, and June 30, 1975, in the amounts of $ 14,400 and $ 39,678.85, respectively. The only issue presented for decision is whether under section 162(a)(1), Internal Revenue Code, [1] amounts paid and deducted by Paramount Clothing Co., Inc. to its two officers, Marvin Goldman and Daniel Goldman, during the taxable years ended June 30, 1974, and June 30, 1975, constituted *464 reasonable compensation for services rendered. FINDINGS OF FACT Some of the facts are stipulated and are found accordingly. Paramount Clothing Co., Inc. (petitioner) is a corporation organized under the laws of the State of Maryland on June 11, 1946. Its principal offices are located at 419 West Redwood Street, Baltimore, Maryland. Its U.S. Corporation Income Tax Returns (Forms 1120) for the fiscal years ended June 30, 1974, and June 30, 1975, were timely filed with the respondent. Petitioner is engaged in the manufacturing of men's suits. Petitioner's authorized capital stock consists of 1,000 shares of preferred stock and 1,000 shares of common stock. Since the time of its incorporation Marvin Goldman (Marvin) and Daniel Goldman (Daniel) have owned all of the outstanding common stock in equal shares. No preferred stock has ever been issued. During the taxable years 1974 and 1975 Marvin was president of the petitioner corporation and a member of its board of directors. Daniel was its secretary-treasurer and a *465 member of the board of directors. History of the Business
Petitioner was founded in 1918 by the father of Marvin and Daniel Goldman to operate as a men's clothing manufacturer. The Goldmans' father, a merchant tailor who made hand-tailored clothing, organized petitioner in an effort to fulfill his ambition of engaging in his own men's clothing manufacturing business. For several years after its inception, petitioner consisted of the Goldmans' father and one of his daughters, who left school at the age of 16 to assist him. From the start, petitioner was located in Baltimore, Maryland. However, the business required that the Goldmans' father go out "on the road" to sell three or four days a week, with packing and shipping accomplished on the weekends. Marvin was born in 1913. He first entered petitioner's business while he was attending junior high school. He worked for petitioner after school and full time, 8 a.m. until 5 p.m. or 6 p.m., during vacation periods. Marvin's activities in the business while he was in school included packing packages, tying packages, running packages to the Post Office, sweeping the floor, and whatever else was necessary. Marvin has *466 worked in petitioner's business ever since he was 13 years old. With the exception of his school years, including one year of college at the University of Baltimore, and his Army service from May 1941 until August 1945, he has worked virtually full time in the business since his graduation from high school. Daniel was born in 1917. He worked part time in the business during school, starting at the age of 10 or 11, including Saturdays and Sundays, and full time in the summers. While he was in school, Daniel's activities in the business consisted of whatever his father wanted him to do, including tying pants and sweeping floors. With the exception of three years, from 1942 until October 1945, during which he served in the Army, Daniel has worked virtually full time in petitioner's business since 1935. From 1934 until the start of World War II, petitioner conducted its manufacturing operations through independent contractors. It bought piece goods, cut the goods and sold the finished goods to its customers. The manufacturing function was subcontracted because petitioner did not have its own factory. It generally sold small concerns during this time. Its most important account *467 was Bell Clothes, a retailer with one store in Baltimore and four stores in Washington, D.C. Petitioner manufactured men's sport coats, top coats, and pants, in addition to men's suits, along with any other kind of men's clothing which was salable. Daniel and Marvin, with their father, were involved in virtually all activities of petitioner's business from 1935 until World War II. Marvin and Daniel went on the road to sell, they worked in the cutting room, in the shipping department, and they even sold to little storekeepers at the petitioner's shop on Sundays. In addition, they visited the contractors who performed the manufacturing operations on petitioner's clothing, to assure that the clothes would be finished in a timely fashion with high quality. Their only employee was a cutter. During World War II both Daniel and Marvin served in the Army, although Marvin continued to work for petitioner even during his military service. Marvin was stationed at Fort Belvoir, and he was able to return to Baltimore every weekend, where he worked in the business. He left Fort Belvoir on Saturdays at noon and returned on Monday mornings. While Marvin and Daniel were serving in the *468 Army, their father had major surgery and began to decline in health. In 1947 their father died. After World War II, piece goods (the cloth used to make clothing) were very scarce. The Goldmans received an inquiry about green colored piece goods used for the Marines. With their veterans' priorities, they were able to purchase these goods and then strip the goods into navy, tan, brown, and other colors for civilian clothing. To finance this plan, they pre-sold the suits, receiving a $ 10 advance for each suit. They sold between 30,000 and 50,000 suits in this manner, generating both substantial income and the impetus to form their own clothing factory. The Goldmans also used their veterans' priorities to obtain machinery for petitioner in 1946, so that petitioner could conduct its own manufacturing operation. The Goldmans did virtually everything in the business from 1946 through 1958, including sweeping the floors when there was not enough help around to do it, packing suits and selling merchandise to individual customers who visited the factory, spreading goods (placing the piece goods on a table and marking the patterns on it), and serving as the salesmen for petitioner. *469 During this period they started to sell different kinds of accounts, such as department stores. Their two largest accounts were The Hecht Company and Woodward & Lothrop. Relationship with Sears, Roebuck & Company
Petitioner began selling to Sears, Roebuck & Company in 1958. Its initial effort to sell Sears was unsuccessful. However, the Goldmans were determined to do business with Sears, and, with the assistance of a men's clothing manufacturer, Howard Schloss, who made a contact with Sears, the men's suit buyer at Sears, Vlad Kay, and his superior, Clarence Sakara, came to Baltimore to see the Goldmans. In 1958, petitioner was manufacturing a wash-and-wear men's suit. Because of its unusual construction, this suit was produced by only a limited number of manufacturers, including Haspel and Palm Beach, the two leaders in the market. Smaller manufacturers did not venture into the wash-and-wear field, which was, therefore, wide open for competition. However, Gayley & Lord, the primary source of the cloth used to make wash-and-wear suits, tried to prevent outsiders such as petitioner from using its cloth. After meeting with Sears, the Goldmans agreed to manufacture *470 wash-and-wear suits for Sears for $ 12.85 each. This was a substantial gamble for the Goldmans and petitioner since they did not even own the piece goods necessary to make these suits. However, Burlington Mills, the parent company of Gayley & Lord, started to produce the wash-and-wear cloth around this time, and Marvin was able to purchase these goods from Burlington, to satisfy the tremendous order placed by Sears with the petitioner. Paramount sold only wash-and-wear clothing to Sears for a couple of years, including approximately 30,000 suits sold by Sears through its catalogue. Petitioner then started to sell Sears other items, including dacron and wool tropical suits. After the Goldmans received the large order from Sears in 1958 to make wash-and-wear suits, they decided that the manufacturing facility operated by petitioner in Baltimore was not large enough. Therefore, they opened a plant in Hampstead, Maryland, using a building, previously operated as a clothing factory, then partially owned by Daniel. This factory is not owned by petitioner. It is today operated by a separate corporation, Maryland Hampstead Company, Inc. (Hampstead), in which each of the Goldmans *471 own all of the outstanding stock in equal shares. The Goldmans hired John Mancini to supervise the Hampstead facility, a role which he still maintains. Petitioner is responsible for manufacturing the suits, including the sewing portion of the operation, which is contracted out to Hampstead. If the quality is wrong, if the garments are not properly made or sewn, or if losses are sustained, petitioner bears the responsibility. Hampstead only has the responsibility of a contractor. Petitioner has the same relationship to Hampstead as it would have with any other contractor who performed work for it. Duties of the Goldmans During the Years in Issue
In 1974, Marvin and Daniel each received a salary of $ 80,000 from petitioner. In 1975, petitioner paid Daniel a salary of $ 100,000 and Marvin a salary of $ 115,000. In 1975 Marvin was traveling to New York to visit the fabric mills one or two days a week, either every week or every other week, and he made some extraordinary buys allowing petitioner to get more business from Sears in that year. Petitioner does not provide the Goldmans with any of the normal perquisites customarily granted to officers of other men's suit *472 manufacturing companies. It has no pension plan or profit sharing plan. It does not offer major medical insurance, disability income insurance or employee life insurance payable to family members. It does not pay for country club dues for the Goldmans. It does own a small life insurance policy on each of the Goldmans, but this is payable to petitioner. In Hampstead, the benefit package offered to its union employees amounts to approximately 34 percent of the employees' salaries. The package of fringe benefits afforded top management in the men's suit manufacturing industry generally (but not given to Marvin and Daniel) costs an extra 30 percent to 40 percent of regular cash compensation.
During 1974 and 1975 the Goldmans worked for petitioner Mondays through Saturdays, and about 20 Sundays per year. They arrived at work about 8:00 in the morning, every Monday through Friday, and generally stayed until 6:00 at night and sometimes later. On Saturdays, the Goldmans arrived at 8:00 in the morning and worked until 12 or 1 o'clock in the afternoon. When they worked on Sundays, they would come down at 10:00 a.m. and leave at 1:00 p.m. Every evening, the Goldmans would talk by telephone *473 with each other for at least 30-45 minutes about what had transpired during the day. In addition, one or the other might call their designer or the foreman in the cutting department. The Goldmans also spoke with Sears during the evenings. During 1974 and 1975 Marvin took only one week of vacation in one year and no vacation in the other year. Daniel took one week of vacation in each year. Neither of the Goldmans was ill during 1974 and 1975.
The Goldmans did not attend any conventions during 1974 and 1975, although Daniel occasionally attended a bobbin show or other industrial show where machinery was exhibited. During the taxable years 1974 and 1975 the Goldmans had total responsibility for running petitioner's business. They always operated in a manner which gave them responsibility over every aspect of the business. The duties which they performed at petitioner have not changed since 1965, although during the years in issue they had more responsibilities than they previously had. During 1974 and 1975 the Goldmans were responsible for all of petitioner's sales, most of the material purchases, the financing, shipping, hiring and firing, and design. During 1974 and *474 1975 Sears sold to petitioner approximately 50 percent of the piece goods which petitioner used to satisfy the Sears account. The other 50 percent of the piece goods were purchased by Marvin, who was an outstanding piece goods buyer. Because of the faith that Sears had in Marvin and his experience, Marvin would go to New York to work with the major mills to accumulate piece goods for use by Sears in its promotions. He was given considerably more options and opportunities to purchase piece goods than Sears provided to the other manufacturers with whom it dealt.Marvin was given carte blanche to go to the mills and buy goods, at mill overruns or special prices, so that Sears could afford its promotions. Marvin had superb relationships with the fabric mills. The mills knew that he was very honorable and that he would do what he said he would do. He had the ability to evaluate an available lot of piece goods for quality, price, salability, and manufacturability. He might review 500 different styles of goods at any time. In purchasing piece goods, Marvin had to select goods suitable to petitioner's manufacturing operation, as well as goods which would be desired by Sears and its *475 customers. The Goldmans shouldered total responsibility for their purchases of piece goods, and they also bore the risks. Sears would have the privilege of rejecting suits if it did not feel that the patterns or colors selected by the Goldmans were needed, or if Sears did not care for the goods. As good as Marvin was in purchasing piece goods, Sears did reject certain goods during the 1974-1975 period. The Goldmans are not told by Sears to purchase only certain types of patterns. During the taxable years in issue, Daniel was responsible for the purchase of linings, buttons, and pocketing which go into the garments produced by petitioner. Sears did not give Daniel instructions as to the purchase of interlinings and pants pockets, the trimmings. Petitioner, through Daniel, was responsible for buying these materials at the best price, and matching the colors to the suiting fabric. In purchasing these materials, Daniel had to select the proper fabric and weight which would conform with the clothing to which these goods would be assigned. With respect to buttons, Daniel would buy the buttons from the supplier designated by Sears. Daniel executed his purchasing responsibilities *476 with respect to linings, pocketings, and buttons efficiently. He was able to deliver suits that incorporated the design expression which Sears wanted. Sears was satisfied with Daniel's performance, which is one of the reasons that petitioner has received the Symbol of Excellence Award from Sears 5 years in a row, and why Sears has desired to continue its business with petitioner. The Goldmans were also responsible for the design and styling of suits for petitioner. They worked with their designer, John Mancini, who actually cut the patterns after the Goldmans told him what they wanted. Marvin and Daniel directed the suit styling which was then submitted in sample form to Sears. Although Sears, as the buyer, had the ultimate decision with respect to the suits that petitioner would manufacture, style and design were constantly discussed between the Goldmans and Sears. Sears actively solicited the Goldmans' advice in this area because they each had 50 years' experience in the business, and, having spent virtually their entire business careers involved in clothing, they had seen the cyclical changes in the market. The Goldmans would show Sears a wider lapel or a narrower lapel, *477 a higher vent or a lower vent, hacking pockets or flat pockets, etc., depending on the trends which the Goldmans anticipated would be in demand. The design process is continuous, and the Goldmans are always changing models. During 1974 and 1975 the Goldmans talked with Sears on the telephone approximately three to four times a day. Petitioner's long distance telephone charges during this period, solely to Sears, were approximately $ 435 per month. The Goldmans and Sears would discuss production, inventory, model trends, cost of fabric, and various other subjects, including seemingly routine matters. The buyer at Sears during 1974 and 1975, Donald Wallin, indicated that he spoke with the Goldmans on a daily basis, probably ten times a week, during this period. In addition, Marvin and the Sears buyer would talk in the evenings, as the Sears executives were quite busy during the day and often out of the office. The Goldmans also spent time during 1974 and 1975 reviewing numerous apparel and equipment magazines, looking for new equipment and production methods, new fabric, and other items that might help in the business. The magazines reviewed by the Goldmans during this period *478 included Turnkey,Retail Week,Southern ApparelManufacturing,Southern Garment, and Apparel magazines. Daniel was responsible during the taxable years for assuring that petitioner had the proper insurance, including fire and extended coverage, public liability, burglary, transportation, and mysterious disappearance insurance. Daniel was also responsible during the taxable years for petitioner's compliance with government controls, rules, and regulations applicable to the men's clothing business, including OSHA and Census Bureau matters. Petitioner does not have a separate customer service department to handle any complaints from Sears or other customers. The Goldmans handle all complaints. The Goldmans, primarily Marvin, are also responsible for material control and for cost control, there being no staff accountant. The Goldmans are also responsible for all personnel work, including union matters, with Daniel more active in this area than Marvin. Daniel is also responsible for repairs and maintenance. Marvin, principally, maintains the daily contact with Sears. There is nobody else at petitioner, except the Goldmans, to carry out these functions, *479 which they performed in 1974 and 1975. Petitioner's financing was the responsibility of both of the Goldmans during the taxable years, although Marvin typically did more in this area than Daniel. Petitioner borrows necessary funds from Maryland National Bank, with whom the Goldmans have dealt for over 50 years. Petitioner maintains proper lines of credit so that funds are available to keep the factory in production. In 1973 and 1974 petitioner had to request lines of credit from Maryland National Bank which were larger than those normally maintained. Its line of credit is negotiated for a 6-month period. For the particular period petitioner will draw moneys down from this line of credit and the total amount borrowed must be repaid at the end of the 6-month term. Special Talents of the Goldmans: Anticipation of Style Changes, Cost Controls, and Manufacturing Methods
One of the major reasons for the success of petitioner and its excellent relationship with Sears has been the ability of the Goldmans to anticipate style changes in men's suits, and to stay away from short-lived styles. One of the popular style changes in the early 70's was the leisure suit. Sears asked *480 petitioner to produce a better-tailored leisure suit. However, the Goldmans did not manufacture the leisure suit because they felt that this item was not a tailored garment and could be made more cheaply by sport or outerwear manufacturers. This assessment proved correct. Another style which appeared in the last 5 to 10 years was the Nehru suit. The Goldmans made some samples of Nehru suits, and several of their customers, including Sears, asked them to enter this market. However, petitioner did not wish to manufacture Nehru suits because the Goldmans felt that they were simply a fad and that the entry of petitioner into this area would be disastrous. The Goldmans were responsible for putting Sears in the double-knit business. Marvin sampled double-knit pants and felt that this would be a tremendous item which would revolutionize the clothing business. He introduced samples of double-knit suits to Vlad Kay, the Sears buyer at the time. As a result, Sears, despite Kay's initial reservations, purchased 5,000 suits in double-knit cloth from petitioner. The Goldmans conceived the double-knit suit used by Sears, and instructed petitioner's designer how to make it. They discussed *481 the potential of the suit with Sears, and the sizing modifications required because of its stretch characteristics. Initially, there were many problems in manufacturing this garment which the Goldmans, and the industry, in general, had to overcome. The double-knit suit was the item that helped put Sears "on the map" with respect to tailored clothing. Petitioner produced all of the Sears double-knit suits, which were first introduced at Sears in 1970 and 1971. Sears built a product line around petitioner's suit, first titled "the Traveller," and later changed to the "Travel Knit." This suit helped Sears achieve increased market penetration. Sears doubled its sales in the two or three years when the Travel Knit suit predominated. Petitioner continued to produce Travel Knit suits for Sears through June 30, 1975. Marvin also advised Sears to introduce vests with their men's suits. In the fall of 1973, or early spring of 1974, Marvin told Don Wallin, the Sears buyer, that many vested suits were appearing in other stores. He suggested that Sears add vests to its Travel Knit suits to continue the success of this item. Although the marketing plans of Sears had already been set *482 for spring, 1974, Marvin persuaded Sears to try vested suits in its major market stores. The 2,000 vested suits initially supplied by petitioner to Sears did so well that Sears suddenly was purchasing a substantial number of vests, and petitioner made all of them. Vested suits have been a continuing and substantial part of the Sears regular lines since fall, 1974. Petitioner initially sold vests to Sears at a price which was below its cost. The Goldmans felt that vests would become so popular that petitioner would make up for the initial losses through extra production. The Goldmans were aware that Sears did not want to deviate from its price categories, and the price reduction by petitioner was added incentive for Sears to introduce vests to their customers. The Goldmans have also counseled Sears with respect to certain other types of suits or suit items. Marvin encouraged Sears to purchase a polywool type of suit, made of a wood-blend fabric. In the spring, 1975, Sears recognized the importance of polywool in the marketplace and they introduced a major mix of the suit, with a vest, labeled the executive suit. Petitioner also manufactured a rope-shouldered suit, called *483 a California coat, for Sears. However, the Goldmans accurately predicted that this type of suit would not endure, and after one good season with it, the Goldmans convinced Sears to return to a conventional style of coat. The Goldmans were instrumental in convincing Sears to match the plaid suits which it purchased from petitioner at all points, as opposed to only a four-way match. The Goldmans felt that this form of matching was necessary to meet the increasing demands of the consumer and to keep the suits salable. The Goldmans felt that plaid suits not fully matched would have to sell for $ 10 to $ 12 less per suit. The Goldmans agreed to match the plaids for an additional $ 1.50 per suit, an amount actually less than their cost of about $ 2.50 per suit. After Sears agreed fully to match their suits, which occurred in 1973, 1974 or 1975, the Sears suit buyer indicated to the Goldmans that he did not know what he would have done if he had not matched the plaids, as the Goldmans suggested. The Goldmans have performed extraordinary services for Sears, a factor which has played a significant role in their success and the long-term relationship of petitioner with Sears. There *484 have been occasions where petitioner has shared a loss with Sears to make the goods salable. Other accommodations which the Goldmans have made to Sears included their agreements to produce vests and matched suits, both at a price which was less than petitioner's cost at the time. The Goldmans have introduced many new concepts in the process of manufacturing men's clothing. The Goldmans were one of very few manufacturers, especially in their size category, to use an examining machine so that they did not have to send their piece goods to an independent examiner. In addition, they eliminated the process of sponging piece goods, a procedure which prevents shrinkage, by purchasing piece goods that were already stabilized--pre-sponged. These innovations, which were introduced by the Goldmans in 1973 or 1974, helped the Goldmans decrease petitioner's costs. In addition, use of an examining machine allowed petitioner to maintain better quality control over the piece goods, with allowances from mills for rejected goods. Most other manufacturers sent their goods out to a public examiner. Petitioner was also one of the first manufacturers in the Baltimore area to purchase and use *485 a photomarker, a machine which streamlined the process of marking piece goods. This item was purchased after the Goldmans had traveled to Philadelphia to observe its operation in another plant. Before the introduction of a photomarker, petitioner employed four people to mark piece goods. With the photomarker petitioner was able to decrease this to two employees, who worked only part time marking piece goods. The photomarker was introduced by the Goldmans to Paramount about 1973. Petitioner was also one of the first men's suit manufacturers in the Baltimore area to introduce certain machinery used in the process of spreading piece goods. At the outset of its business, piece goods were spread by hand by two people. However, the Goldmans introduced several items of equipment to this process including a plain spreading machine, then an Edgematic, then a Champion spreader, and finally a lifter. As a result of the introduction of this machinery, the Goldmans were able to convince the union to allow petitioner to employ only one man in the spreading operation. Because of these various devices, the employee engaged in this process was more productive and less taxed physically from the *486 task. This series of machinery was first put into operation by petitioner somewhere during 1972-1973 or 1974. Other manufacturers, after observing Paramount's use of new machinery, then began using the same machinery. Paul Sachs is employed by petitioner to make up the cutting slips and supervise the cutters. He also receives the purchase orders from Sears, and compiles the finished goods report, indicating to Sears that the goods are ready for shipment. Although Paul Sachs is capable of carrying out his job, he reports to the Goldmans, who are responsible to make sure that the goods are cut properly. In addition, the Goldmans review cut garments to be certain that waistbands, lapels, belt loops, and other items are the proper width, and if not, they take appropriate corrective action. Cut goods are assembled and sent to Hampstead for sewing. After the goods are sewn by Hampstead, they are returned to petitioner for assembly. The goods are matched by lot, size, cut, and shade. The Goldmans are responsible for this operation, and they go into the factory and examine suits at random to check that the assembly was carried out properly by their employees. The Goldmans have *487 engineered certain cost and timesaving features in the matching procedure used by petitioner with respect to goods shipped back from Hampstead. In addition, they initiated a color-coded system which assists in the performance of the cutting operation. These innovations, and others, introduced by the Goldmans, are the types of things which they have been doing in petitioner's business since its incorporation. The fully assembled garments produced by petitioner for Sears are distributed pursuant to purchase orders which are received from Sears. Sears specifies the basic color, year, model, and style of piece goods. They also specify the size and cut. However, it is the responsibility of petitioner and the Goldmans to supply the Sears fashion centers, where the goods are shipped, a good assortment of plaids, stripes, and plain colored goods. Sears does not detail by patterns. The mix must also take into account the area where the goods are being sent, as each area requires something a little different. The Goldmans instruct their employees regarding assembly of the proper mix of goods to fill a Sears order. They have developed a know-how in picking goods for Sears' fashion *488 centers. If petitioner sent too many bad shipments, Sears would have a very difficult problem, and the fashion centers would no longer want its goods. Finished goods which have been assembled to fill a Sears order may be shipped in various ways, but most are sent by truck. The goods must be placed in the truck in a precise way or else the fashion centers will send the goods back to petitioner. The Goldmans have successfully operated petitioner in a manner so as to control their costs and keep their prices within Sears' "price points." They perform all the administrative functions, while other manufacturers employ separate personnel to perform each of these functions. Other manufacturers employ salesmen, piece goods buyers, lining buyers, production managers, and designers. The Goldmans handle all of these functions and duties for petitioner. Many manufacturers of men's suits have been unable to remain cost competitive, and, as a result, have lost Sears' business. These manufacturers were unable to keep their prices within Sears' price points. Petitioner could not have survived, or made a profit, unless the Goldmans performed the sales function for petitioner without *489 salesmen. Their cost control in performing numerous functions is a major reason for petitioner's survival in the business, while other men's suit manufacturers have gone bankrupt. There are only 5 clothing manufacturers left in Baltimore out of 100 that were once present. Sears' Perception of Petitioner and the Hazards of the Men's Clothing Industry
Donald A. Wallin (Wallin) has been the senior buyer at Sears for all men's tailored clothing, including men's suits, sport coats, and tailored slacks, since February 1, 1977. From February 1, 1973, to February 1, 1977, Wallin was Sears' full buyer of the men's suit line in the men's tailored clothing department. He was engaged in this position for the entire period encompassing the taxable years 1974 and 1975. Wallin has been employed by Sears for 24 years, receiving a steady series of promotions during that time. In one of his earlier positions at Sears, Wallin's primary responsibility was working directly with each manufacturer of finished garments with which Sears dealt on a day-to-day basis, as well as with the piece goods mills. He would also issue the cutting tickets which indicated the size scales to be utilized by *490 the manufacturers. Wallin's responsibilities as the full buyer for the men's tailored suit line were to examine the marketplace, work with the ten manufacturers with whom Sears dealt, and to build the suit line which would be marketed and distributed to Sears retail stores through its five fashion centers. From February 1, 1973, until June 30, 1975, Wallin was in contact with petitioner and the Goldmans on a daily basis. At the time petitioner was making the Travel Knit suit for Sears, which was the item that really put Sears on the map in terms of men's tailored clothing.Wallin had also been in contact in the late 1960's with petitioner and the Goldmans as assistant buyer in the men's suit line. Petitioner was the prime source with which he conducted business at this time although he then worked with five manufacturers. From February 1, 1973, until June 30, 1975, petitioner was the most helpful to Sears of the ten men's clothing manufacturers with whom Sears conducted business.Wallin actively solicited Marvin's advice and counsel with respect to the marketplace. Marvin would go to the piece goods market and visit with the major mills, and then discuss with Wallin information *491 on trends and directions in the industry. Wallin could speak with Marvin "one-on-one" in all areas of the men's suit manufacturing business, including piece goods, cost of trimmings, and style changes. With other manufacturers, Wallin would have to speak with three or four people just to get the same imput and market knowledge. In the other nine companies which manufactured men's clothing for Sears, there was a separate individual responsible for each phase of the production so that no one individual could provide the answers that Wallin would need. With petitioner, Wallin could simply talk to Marvin, as he wore all five hats. Wallin received more imput and guidance from petitioner in developing the suit line than he received from the other nine men's suit manufacturers with whom Sears dealt. In Wallin's opinion petitioner rates as the best of the ten men's suit manufacturers with whom Sears dealt during 1974 and 1975. The Goldmans made Wallin's job easier and took away a lot of the burden. Because petitioner and the Goldmans do the best job of execution, Wallin can concentrate on other areas, knowing that petitioner will deliver its goods in top quality fashion, and literally *492 trouble-free. Marvin was the one individual who helped Wallin create and build the total men's suit line for Sears. Although petitioner does not make garments in all of Sears' five price points, Marvin was aware of the other lines carried by Sears. He would constantly inquire as to the types of goods that Sears was purchasing, with suggestions as to style changes Sears might make with respect to the goods that they purchased, such as his suggestion concerning vested suits. As a result of Marvin's suggestion concerning the introduction of vested suits in Sears' line, vested suits became the "in demand item for the consumer," and Wallin received an award called "The Sears Best Award." Sears is petitioner's major customer. Sales to Sears accounted for 85 percent or 90 percent of petitioner's sales in 1974-1975. As a result of this concentration, the Goldmans have more responsibilities, not fewer responsibilities than other clothing manufacturers. Sears is and always has been more exacting than any individual customer. Because the Goldmans rely so heavily on Sears for their business, they must always stay on their toes and accommodate Sears. This disadvantage would not be present *493 if petitioner had 200 accounts, so that a loss of 2 or 3 accounts would not cause a loss of the business. Petitioner does not have a long-term contract with Sears. Petitioner and Sears contract almost from season to season. The fact that petitioner could be dropped by Sears at any time increased the risk to it.
Petitioner received the Symbol of Excellence Award from Sears for five consecutive years--1974, 1975, 1976, 1977, and 1978. Each year's award represents its performance in the immediately preceding year. This award, which was established by Sears approximately 13 or 14 years ago, is presented on an annual basis to less than 5 percent of Sears' regular suppliers of all types of merchandise. It recognizes the excellence of the manufacturer in servicing Sears, combined with the construction of a quality product, which provides good value, and which the suppliers deliver relatively free of any service problems to Sears' distribution centers. The only other men's tailored clothing manufacturer to have received the Symbol of Excellence Award from Sears was Cross Country Clothes which received the award twice, in earlier years around 1969 or 1970. Out of the approximately *494 600 regular manufacturers which receive the Symbol of Excellence Award from Sears, only 200 have received the award for five years.It becomes more and more difficult for a manufacturer to maintain the standards for the award and consistently to receive it. The Symbol of Excellence Award is given to manufacturers after selection by a Sears' committee. Wallin would make a recommendation to his superior based upon the performance of a given manufacturer and of his product. Wallin's superior, in turn, would submit the recommendation to the company committee, which is comprised of members of Sears' testing lab that are involved in examining the product. The committee examines the product for conformance to quality standards, timely distribution, and the product's relative freedom from service problems. Many recommendations are rejected each year. Approximately 10 years ago, there were 10 manufacturers of men's clothing producing suits for Sears. Of those 10 manufacturers, only 3, the petitioner, Cross Country Clothes, and Joseph & Feiss still sell to Sears. The other firms are no longer in business, having gone out of business after terminating their relationships with Sears. *495 These firms, such as Michael Stern, Sagner, and Craigmore Clothes, were unable to re-engineer or adjust their pricing situation to satisfy Sears' needs. Since that time, Sears has adopted and has become involved with some Southern, low-cost outer-wear type of manufacturers in obtaining their goods. One of the main advantages derived by Sears in dealing with petitioner was its ability to adjust suit production, in the course of the production cycle, to meet the demands of the Sears distribution centers. If adjustments were necessary, Wallin would telephone Marvin, or Marvin would telephone Wallin, and petitioner's cuttings would be adjusted accordingly. This could be done easily with petitioner because Marvin controlled the cutting room, whereas, in other firms with which Sears dealt, the president of the company typically was in a New York office and the factory was in a different location. On the short side, it would take a week for the other manufacturers to make the kinds of necessary decisions that Marvin was able to make on the spot. The other firms were simply not as flexible as petitioner. The suits provided by petitioner to Sears amount to slightly over 20 percent *496 of the total Sears' purchases of men's suits in the entire United States. The Goldmans understand Sears' business very well because they work so closely with Sears in all phases of the operation.Sears talks with the Goldmans, and seeks their advice, in all areas, from procuring the piece goods to styling the garment and suggesting the width of lapels. The Goldmans have spent their entire business careers in the clothing industry and are familiar with the cyclical changes. No other men's clothing manufacturer in the country has been able to retain Sears as a customer with the success of petitioner. Sears is very demanding. It does not negotiate; a manufacturer must meet its needs and demands. The Goldmans have always found a solution to answering Sears' needs. The Goldmans have been able to maintain Sears as a customer in spite of the fact that Sears has gone offshore and to non-union manufacturers to obtain clothing. The Goldmans and petitioner have been able to survive in a very hazardous industry. The men's tailored clothing manufacturing industry has gone through a disastrous period in the last ten years. There have been several fashion changes and each was rather violent *497 to the industry productionwise. In addition, the industry has moved into southern non-union firms or to offshore points. Today approximately 30 percent of all suits in the United States are manufactured offshore. From 1967 to 1976, there was a 31 percent shrinkage in the number of workers in the men's tailored clothing industry, and those remaining workers spent 33 percent less hours working in the field. Between 1971 and 1976, 310 men's tailored clothing manufacturing companies, or one-third of the total number of companies, have gone out of business. 196 of these companies closed between 1974 and 1976. This decline is still continuing today. Several of the important men's suit manufacturers who have gone out of business over the last five to seven years include Sagner and Raleigh Clothes, both of whom did approximately $ 18 million in business per year. Sagner closed in 1974 and 1975 and Raleigh closed about 1972 or 1973. Others that terminated business during this period were Fashion Park, which formerly had $ 15 million in sales, Steinbloch, Kuppenheimer's with $ 17 to $ 18 million in sales, Trimount, with $ 30 to $ 40 million in sales, Daroff, with $ 50 million in annual *498 sales, Friedman-Marks, and Michael Stern, which at one time did about $ 14 to $ 15 million in sales. The Time Devoted to Petitioner by the Goldmans
During the taxable years 1974 and 1975 the Goldmans each spent around 60 hours per week on business matters. Their vacations do not exceed one week a year, and in one taxable year, Marvin took no vacation. They are "workaholics." Marvin and Daniel own stock in a number of corporations in addition to petitioner. Each of the Goldmans received salaries from five of these corporations during 1975. All of the salaries were for services rendered by the Goldmans to the respective corporations. However, the Goldmans did not devote more than 10 hours per week to their business activities unrelated to petitioner. The following chart sets forth the names of the other corporations, the salaries if any were paid to the Goldmans in the aggregate, percentage of stock owned by the Goldmans in the aggregate, the average aggregate weekly time, if any, devoted by the Goldmans on a combined basis, and the business activity, if any, of the corporation: [SEE TABLE IN ORIGINAL] Maryland Hampstead Company, Inc. (Hampstead) is a corporation *499 which sews the coats, pants, and vests manufactured by petitioner. The Goldmans spent four to five hours per week, combined, on the affairs of Hampstead. They would review the manner in which work was progressing at the Hampstead facility, take care of any large problems that would arise, including certain union negotiations, insurance matters, the purchase of new equipment, and modernization of plant facilities that might be necessary. John Mancini was in charge of the Hampstead operation during 1974 and 1975. With the assistance of a foreman, and about six supervisors, John Mancini handled all the day-to-day operations, including production, machinery repair, and minor labor disputes. In addition, Mancini had responsibility for hiring and firing employees. John Mancini and his foreman were capable of running the day-to-day operation of Hampstead.Hampstead is a union shop which employs approximately 300 employees. The union negotiates all raises and benefits. The raises and benefits are negotiated nationally and Hampstead has no control over them. Ten Calvert Corporation owns and operates an office building at Ten Calvert Street in Baltimore. There are approximately 140 *500 or 150 tenants in this building. The building is managed by Sam Sher, the Goldmans' brother-in-law.The Goldmans' sisters, who each own one-sixth of the stock of this corporation, did not draw any salaries. The Goldmans received salaries because of their help in shaping the policy of the Ten Calvert building and the role which they played as consultants to the other shareholders and Sam Sher regarding the building. Matters concerning this building, including policy, repairs, rental policies, and whether or not the building should be sold, were discussed by the Goldmans and the other stockholders and Sam Sher approximately once a week at family gatherings. In addition, the Goldmans would spend about an hour per week on the affairs of this building. One-Ten Paca Corporation owns a 9-story office building, known as the Paca-Pratt Building, which is rented to the General Services Administration. Milton Schwaber, as associate of the Goldmans in several real estate investments, owns 50 percent of the One-TenPaca stock. During 1974 and 1975 Daniel was responsible for any problems that came up in connection with the operations of the Paca-Pratt Building, which he would resolve in *501 consultation with Milton Schwaber and Marvin. The Goldmans and Schwaber also spent time discussing policy with respect to this building. Marvin spent less time in connection with the affairs of One-Ten Paca Corporation than Daniel did. During 1974 and 1975 the Goldmans and Schwaber were engaged in the negotiation of a lease with the Government Services Administration for the Paca-Pratt Building. Daniel was responsible for the actual lease negotiations. Part of the reason why Daniel received substantially more salary from One-Ten Paca Corporation than his brother is because Daniel negotiated a new lease with the government for a rental which was approximately $ 250,000 per year more than either Marvin or Milton Schwaber had wanted. The lease negotiated by Daniel extended for three years, with two one-year options. The Goldmans are also stockholders in Civic Howard Corporation, an entity which owns and operates an office building located at Howard and Lombard Streets in Baltimore. During 1974 and 1975 seven floors of the Civic Howard Building were occupied by the Social Security Administration, pursuant to a lease with the General Services Administration, and one floor was rented *502 and occupied by the Maternity Center of Baltimore City. During 1974 and 1975 the Goldmans, in conjunction with Mr. Schwaber, performed the overall policymaking of the Civic Howard Corporation and took care of the problems and complaints related to the Civic Howard Building. They consulted almost every night with Mr. Schwaber. Pursuant to the lease with General Services Administration, the Goldmans were required to be available to handle the problems associated with the building. The Goldmans were also responsible for handling problems that could not be taken care of by the building manager. In total, the Goldmans spent approximately one to two hours per week on the affairs of Civic Howard Corporation. In addition to their day-to-day work with Civic Howard Corporation during 1974 and 1975, the Goldmans, with Mr. Schwaber, negotiated a lease with the Social Security Administration (through the General Services Administration), for the Civic Howard Building. Through newspaper articles, the Goldmans found out that Social Security would be moving to a new location in the future. Therefore, in connection with these negotiations, the corporation had to start accumulating funds to *503 renovate the Civic Howard Building, built before 1904, to accommodate multiple tenants. In the negotiations conducted by the Goldmans with the government over the leasing of space in the Civic Howard Corporation and One-Ten Paca Corporation, negotiating periods would generally not last more than an hour or an hour and a half per week, and negotiations would sometimes extend over a period of time--six months to a year. During 1974 and 1975, S & G Realty Company leased a warehouse in Richmond, Virginia, to A & P on a net lease basis. Milton Schwaber owned 50 percent of the stock in S & G. Part of the Goldmans' compensation from S & G was related to the fact that they had not taken salaries in previous years for work done, because they were waiting until S & G was in a position to pay them salaries for the work. East Hartford Holding Company owned a warehouse building in Hartford, Connecticut, which was leased to A & P on a net lease basis. Milton Schwaber owned 50 percent of the stock of this corporation. The salaries received by the Goldmans from East Hartford Holding Company in 1975 represented their work in connection with certain problems which the corporation had with *504 the roof and paving at the leased property, and also payment for certain of the work performed by the Goldmans in past years for which they had not been compensated. Northwood Corporation owned and operated the Northwood Shopping Center located at Northwood and Havenwood Road in Baltimore. Milton Schwaber owned 50 percent of the stock. Northwood Shopping Center had approximately 25 tenants. The Goldmans were involved in overall policy for this corporation, including center operations, tenant problems, and leasing problems. Sam Sher was in charge of the daily activities of Northwood Corporation. Reasonableness of the Compensation Paid to the Goldmans by Petitioner
Ted S. Decker (Decker), a witness for the petitioner, is an expert in the men's suit manufacturing industry and with respect to compensation paid by men's clothing manufacturers and suit manufacturers to executives in this field. He has had long and impressive experience in these areas, and was well qualified to testify with respect to these fields, as indicated below. A. From 1954 through 1973 Decker held several executive positions with L. Greif & Bros., Baltimore, Maryland, the largest and most successful *505 manufacturers of men's clothing in the United States. From 1971 to 1973 Decker had nine different men's apparel companies under his supervision, as senior vice president of manufacturing for Genesco Corporation's Men's Apparel Group, including L.Greif & Bros. and Phoenix Clothiers, two sizable men's clothing companies. In 1973 Decker was appointed president of L. Greif & Brothers. B. Decker is presently a business consultant for Genesco, L. Greif, Palm Beach, Lebow Brothers, and Haas Tailoring, all well-known men's clothing manufacturers. In this capacity he has been asked to render his opinion as to the executive compensation offered by these corporations. He has served these firms since 1974. C. Decker is presently associated with the executive search firm of Coltan, Bernard and Seitchik of San Francisco. This organization specializes in searching for executive talent in the apparel and textile industry. In this role, he is very well acquainted with the salary needs and compensation arrangements that are made in the apparel industry. D. From 1968 through 1976 Deceker served as chief of the labor negotiating committee for the Clothing Manufacturers Association of *506 the United States, a committee with which he is still involved.In this position he had access to a massive amount of data on member companies, including overhead costs in the various businesses, which took into account executive compensation. E. In 1974, Decker performed a detailed management compensation analysis for Palm Beach Clothing Company, including a comparison of that firm's management compensation to other clothing firms and other industries in general. Decker conducted a similar study for Fairlanes Corporation, a recreation firm with headquarters in Baltimore, in his position as head of Fairlanes' management compensation committee. Decker heard the testimony of the Goldmans at this trial. In addition, he examined the financial statements of Paramount for 1974 and 1975, as well as certain financial information of Paramount for earlier years, including records of sales, the Goldmans' salaries, and net income. He also personally visited petitioner's factory and inspected its operation. Decker had no contact with either of the Goldmans prior to his employment as an expert to examine the compensation paid to the Goldmans by petitioner in 1974 and 1975. He had previously *507 heard of the Goldmans' general reputation in the men's clothing industry. Decker knew that the Goldmans ran a very low-cost operation. He also knew that the Goldmans were one of the few manufacturers able to retain Sears because of their unique talents in controlling costs. Much of Decker's knowledge came from the clothing workers' unions, who held the Goldmans up as a model example of manufacturers able to remain cost competitive with off-shore and non-union manufacturers. Decker's opinion was that petitioner is a "one-of-a-kind" and "unique" business. In his experience, he knows of no men's suit manufacturing company, small or large, in which two people are the "whole show," as is the case with petitioner. The Goldmans are able to run petitioner's business themselves, without support or backup, because of their ability and talents to keep things simple, make decisions quickly, and "be done with it." In a typical men's tailored clothing manufacturing company, with around $ 4,000,000 - $ 7,000,000 of sales, there would be a sales manager and sales force on commission. In addition, there would be a piece goods buyer, a financial man, a manager of customer service, a production *508 manager, and a shipment manager. The Goldmans' talents and ability to keep things simple and make decisions allow them to perform all of these functions. The salaries drawn by the Goldmans between 1964 and 1970 were substantially smaller than the average in the industry for a company of petitioner's size. In its fiscal years 1964 through 1970, the Goldmans received compensation from petitioner as follows: Year
Marvin Goldman
Daniel Goldman
1964
$ 6,450
$ 6,450
1965
8,100
8,100
1966
7,500
7,500
1967
8,100
8,100
1968
7,500
7,500
1969
22,800
22,800
1970
23,320
23,320
A firm could not have employed anyone to perform the duties of the Goldmans for the salaries which petitioner paid to the Goldmans during this period. A successful men's suit manufacturing company could not have expected to obtain a chief executive in the open market, in 1964, for even $ 50,000. The Goldmans were paid low wages in these prior years in an effort on their part to build the strength of petitioner so it could grow. They purposely kept their compensation to a minimum in the 1960's to enable petitioner to build up equity so that it could expand. In Decker's *509 opinion the Goldmans were also underpaid by petitioner in 1974 and 1975. He based this opinion, in part, upon the total financial picture of petitioner, the sales generated by the Goldmans, their ability to keep petitioner's overhead under 10 percent, the qualifications of the Goldmans, the extent and scope of their work, the size and complexity of petitioner's business as well as its gross and net income, or its profitability, and the time that the Goldmans spent performing their duties for petitioner. The compensation paid to the Goldmans during 1974 and 1975, when viewed as a percentage of the sales of petitioner in the respective years, was under the industry norm. Decker was familiar with compensation paid to salesmen for men's suit manufacturing companies and, during 1974 and 1975, the industry average for compensation provided by a men's tailored clothing manufacturer to its salesmen was between 5-1/4 percent and 5-1/2 percent commission on sales, representing the commission cost plus the fringe benefits. In the firm in which Decker was employed from 1954-1973, L. Greif & Bros., there were persons who did purely selling who earned over $ 150,000 per year. Other men's *510 suit manufacturers of a comparable size to petitioner pay various fringe benefits to their top management, including major medical, bonus arrangements, substantial pension and profit sharing plans, medical insurance for the executive's entire family, and automobile, country club dues, insurance, and stock option plans. None of these is available at petitioner. The fringe benefits afforded top management generally cost between 30 percent to 40 percent normal compensation. As part of his analysis of the compensation paid by petitioner to the Goldmans during 1974 and 1975, Decker made written comparisons of its financial performance against industry statistics which he compiled from Robert Morris Associates and the American Apparel Manufacturers' Association. Each of these organizations compiles industry-wide statistics in the men's clothing manufacturing field. In his analysis of Paramount's percentage of pretax income to sales, as compared with the industry average, and the average for men's suit manufacturers with sales volumes from $ 1 to $ 10 million, petitioner bettered both groups in 1974 and 1975. In 1974 its percentage of profit to sales was 5.36, against an industry *511 average of 5.4 and a percentage of 2.5 with respect to those manufacturers doing business of $ 1 to $ 10 million in sales. In 1975 petitioner's percentage was 4.44, as against 3.3 for the general industry and 2.6 percent for the $ 1 to $ 10 million sales group. Its percentage was better than the overall industry in all years analyzed, from 1967 through 1975, except in 1967 when petitioner was slightly below the industry-wide average. With respect to petitioner's percentage of pretax net income to its net worth, in each of the years studied, 1967 through 1975, its percentage exceeded the industry percentage, except in 1975 when the industry was a little better, 20.0 as compared with 18.34 for Paramount. The financial analysis made by Decker which he considered of primary significance in assessing petitioner's performance was a comparison of its percent of overhead to its sales, in contrast to the industry average. Petitioner was far superior to the industry in each of the years for which industry figures were available, 1972-1975. In 1974, petitioner's percentage was 7.84, as contrasted with an industry percentage of 16.5. In 1975 its percentage of overhead to sales was 9.36, *512 in contrast with an industry figure of 17.2 percent. In all of his experience, Decker had never seen a men's suit manufacturing company with an overhead of 10 percent or under. In his financial analysis Decker also analyzed the total salaries and wages paid by petitioner, including officers and other employees, as a function of its sales. In his comparison with the general men's suit manufacturing industry, from 1973 through 1975, the years for which industry figures were available, petitioner consistently outperformed the industry. In 1974 petitioner's percentage was 5.15, in contrast with a figure of 8.6 for the industry. In 1975, its percentage in this area was 6.9, as compared with 8.9 percent for the industry. Decker supervises Esquire Sportswear, which makes tailored sportswear. During 1973 and 1974 Esquire Sportswear had about $ 8 to $ 10 million in sales volume. In 1973 the two chief executives of this company received $ 80,000 each, and they did not perform the functions performed by the Goldmans. Esquire Sportswear also had a sales manager, a sales force, a production manager, an office manager, a piece goods buyer, and a New York office. The use of Hampstead, *513 by petitioner, to perform the sewing function for it has no effect on the reasonableness of the compensation paid by petitioner to the Goldmans. Its use of Hampstead is no different than if it had an independent contract shop perform the sewing function, something which petitioner had previously done and other manufacturers now have. In 1974 petitioner had sales of $ 5,276,644 and, in 1975, its sales declined to $ 4,587,502. Although there was a decrease of approximately $ 699,000 in sales from 1974 and 1975, petitioner did very well in 1975. Several men's suit manufacturers went into bankruptcy during 1975. The economy was bad, there was a sharp drop-off in retail sales, and imports hit very heavily in the marketplace. The Goldmans did a better job with petitioner in 1975, showing a smaller net income after taxes, than they did in the four previous years. They beat the downtrend and outperformed the industry. In his capacity as a full buyer in the suit line, Donald Wallin, Sears' senior buyer, had become familiar with the compensation paid by other manufacturers to people like piece goods buyers and trimming buyers in 1974 and 1975. In the early 1970's, piece goods buyers *514 and trimmings buyers each were earning about $ 50,000 to $ 60,000 per year. These piece goods buyers were not responsible for styling the garment. All they did was buy the piece goods. The firms with which they worked had a separate sales manager, a piece goods buyer, a trimmings buyer, a stylist and a quality control man, and a production manager. Many of the other manufacturing firms would also have someone else in charge of financing. There are no supervisory personnel at petitioner other than the Goldmans. They run the entire operation. The Goldmans determined their salaries for 1974 and 1975 based upon what they felt they were worth. They never related their salaries to net profits. Both of them thought their salaries should have been higher for all of the services they performed for petitioner. For example, they knew that a salesman in their field would receive a sales commission of 5 percent. If such a salesman sold $ 4 million worth of clothing, he would receive $ 200,000. In 1974 the Goldmans drew a total salaries of $ 160,000, with sales in excess of 4.5 million. In 1975, the total compensation drawn by the Goldmans from petitioner was $ 215,000. A comprehensive *515 summary and analysis of certain financial information concerning petitioner is set forth in the tables which follow. FINANCIAL DATA OF PARAMOUNT CLOTHING CO., INC.
Compensation of Goldmans
[SEE TABLE IN ORIGINAL] Net Worth
Total Salaries *
1964 $ 301,817
$ 72,676
1965
310,506
63,708
1966
334,628
66,502
1967
347,137
75,066
1968
374 ,008
68,103
1969
420,316
110,730
1970
469,294
110,054
1971
534,882
140,318
1972
715,453
156,292
1973
871,207
246,584
1974
1,006,814
271,810
1975
1,103,381
316,645
PARAMOUNT CLOTHING CO., INC. Performance Ratios
[SEE TABLE IN ORIGINAL] PERFORMANCE RATIOS OF PARAMOUNT CLOTHING CO., INC.
GOLDMAN'S COMPENSATION AS PERCENTAGE OF: [SEE TABLE IN ORIGINAL] On its Federal corporate income tax returns for the fiscal years ended June 30, 1974, and June 30, 1975, petitioner claimed the following deductions for officers' salaries: Marvin
Daniel Fiscal Year Ended
Goldman
Goldman
June 30, 1974
$ 80,000
$ 80,000
June 30, 1975
115,000
100,000
In his notice of deficiency *516 dated August 10, 1977, respondent made the following adjustments with respect to the deductions claimed by petitioner for compensation paid to its officers: Marvin Goldman
Daniel Goldman Fiscal Year Ended
Allowed
Disallowed
Allowed
Disallowed
June 30, 1974
$ 65,000
$ 15,000
$ 65,000
$ 15,000
June 30, 1975
65,000
50,000
65,000
35,000
ULTIMATE FINDINGS OF FACT The amounts paid by petitioner to Marvin and Daniel Goldman for the taxable years ended June 30, 1974, and June 30, 1975, were reasonable compensation for personal services rendered, and the entire amounts of such compensation were properly deducted in those years under section 162(a)(1) of the Code. OPINION The only issue in controversy here is whether the petitioner is entitled to deduct $ 160,000 in its taxable year ended June 30, 1974, and $ 215,000 in its taxable year ended June 30, 1975, for compensation paid to Marvin and Daniel Goldman, its two officers. Respondent determined that the compensation paid to the Goldmans was excessive and disallowed $ 30,000 in 1974 and $ 85,000 in 1975. *517 Petitioner bears the burden of proving that it is entitled to the deductions claimed. Botany Worsted Mills v. United States,278 U.S. 282 (1929). The deductibility of the compensation paid to the Goldman brothers turns on the meaning of section 162(a)(1) which permits a taxpayer to deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered." To be deductible, it must be established that the payments: (1) were actually intended to be paid purely for the services, and (2) did not exceed the reasonable compensation for the services actually rendered. Sec. 1.162-7, Income Tax Regs.; Electric & Neon, Inc. v. Commissioner,56 T.C. 1324, 1340 (1971), affd. without opinion 496 F. 2d 876 (5th Cir. 1974); Nor-Cal Adjusters v. Commissioner,503 F. 2d 359, 362 (9th Cir. 1974), affg. a Memorandum Opinion of this Court; Klamath Medical Service Bureau v. Commissioner,29 T.C. 339, 347 (1957), affd. 261 F. 2d 842 (9th Cir. 1958), cert. *518 denied 359 U.S. 966 (1959). Whether the petitioner intended the payments to be compensation for services presents a question of fact, to be resolved on the basis of all the surrounding facts and circumstances. Paula Construction Co. v. Commissioner,58 T.C. 1055, 1059 (1972), affd. without opinion 474 F. 2d 1345 (5th Cir. 1973); Electric & Neon, Inc. v. Commissioner,supra.Similarly, the reasonableness of the amount of the compensation presents a factual issue. Charles Schneider & Co. v. Commissioner,500 F. 2d 148, 151 (8th Cir. 1974), affg. a Memorandum Opinion of this Court, cert. denied 420 U.S. 908 (1975); Pacific Grains, Inc. v. Commissioner,399 F. 2d 603, 605 (9th Cir. 1968), affg. a Memorandum Opinion of this Court; Levenson & Klein, Inc. v. Commissioner,67 T.C. 694, 711 (1977); Pepsi-Cola Bottling Co. of Salina v. Commissioner,61 T.C. 564, 567 (1974), affd. 528 F. 2d 176 (10th Cir. 1975). The factors generally *519 considered relevant in determining the reasonableness of compensation include: the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * [Mayson Mfg. Co. v. Commissioner,178 F. 2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court.] Commercial Iron Works v. Commissioner,166 F. 2d 221, 224 (5th Cir. 1948), affg. a Memorandum Opinion of this Court; Pepsi-Cola Bottling Co. of Salina v. Commissioner,61 T.C. at 567-568; Dahlem Foundation, Inc. v. Commissioner,54 T.C. 1566, 1579 (1970). No single factor is decisive; rather, we must consider and weigh the totality *520 of the facts and circumstances in arriving at our decision. Mayson Mfg. Co. v. Commissioner,supra.
We think the evidence in this record clearly establishes the reasonableness of the compensation paid for the valuable services performed for petitioner by Marvin and Daniel Goldman during the years in question. There is no doubt that the Goldmans, through their ingenuity and hard work, were primarily responsible for the success of the business. Obviously they have been the heart and soul of petitioner for over 30 years, although their combined salaries are less than 5 percent of sales. Edwin's Inc. v. United States,501 F. 2d 675, 678 (7th Cir. 1974); Schanchrist Foods, Inc. v. Commissioner,T.C. Memo. 1977-129. While we will specifically refer only to those factors on which we have placed the greatest reliance, we have carefully considered all relevant criteria in reaching our conclusion. The facts are fully detailed in our findings. Some of the most important ones which have influenced our judgment can be summarized as follows: 1. The Goldmans had extensive duties and responsibilities with respect to the operations *521 of petitioner during the taxable years 1974 and 1975, and indeed in every year since its incorporation in 1946.
2. Petitioner's success in retaining its business with Sears is primarily attributable to the total commitment of the Goldmans. They have had an enormous influence on Sears' styling by anticipating style changes in men's suits. They were responsible for putting Sears into selling double-knit suits and vested suits. 3. The ability of petitioner to stave off competition from off-share and non-union manufacturers and generally to outperform the industry is attributable to steps taken by the Goldmans in the use of technology and their accurate perceptions of the demands on the men's tailored clothing industry. 4. The men's clothing business is very hazardous. A substantial number of manufacturers have gone out of business in the last decade. 5. Petitioner does not provide the Goldmans with fringe benefits normally granted to other business executives. 6. The Goldmans are hard working people, having devoted at least 50 hours per week to petitioner's business. 7. The Goldmans were substantially underpaid in prior years so that petitioner could retain as *522 much capital as possible for future growth. 8. The Goldmans are responsible for and active in every aspect of petitioner's business, including sales, production, material purchases, financing, shipping, and customer service.They perform the duties and functions for petitioner which are generally conducted by at least five persons in other men's tailored clothing manufacturers of similar size. 9. Salaries paid to other executives in the men's clothing manufacturing industry, both in prior years and during the taxable years here involved, show that the Goldmans have been underpaid. We note that substantially all of the testimony supports the conclusion that the amounts paid to the Goldmans constitute reasonable compensation for services actually rendered. In addition to the credible testimony of Marvin and Daniel Goldman, petitioner offered the testimony of two witnesses--Donald Wallin, Sears' head buyer of men's suits during the taxable years 1974 and 1975 and a recognized student of the industry; and Ted S. Decker, one of the leading experts in the country on men's tailored clothing manufacturing and on the subject of executive compensation in that industry. Mr. Decker's *523 unequivocal opinion was that the salaries paid to the Goldmans were reasonable. [2]
Respondent points out that petitioner, in its long history, has never paid a dividend. Hence it is argued that "this case is perfectly fit for application of the McCandless doctrine." Respondent refers to the "automatic dividend rule" for closely held corporations enunciated in Charles McCandless Tile Service v. United States,422 F. 2d 1336 (Ct. Cl. 1970). In that case the Court of Claims found that the compensation paid by a closely held corporation with a poor dividend record to its two shareholder-officers was within the realm of reasonableness, but it nevertheless concluded that a portion of the purported compensation was not in fact paid for services rendered and was therefore in reality a dividend distribution. In cases decided after McCandless the Tax Court has repudiated any "automatic dividend rule" based solely on a poor dividend record by stating that *524 "while the absence of dividends may indicate the presence of disguised dividends, it does not convert compensation determined to be reasonable into dividends." Davis & Sons, Inc. v. Commissioner,T.C. Memo. 1975-229; Laure v. Commissioner,70 T.C. 1087, 1098 (1978). In another opinion of this Court it was held that, although the absence of a dividend was "significant," other factors were important. Nor-Cal Adjusters v. Commissioner,T.C. Memo. 1971-200, affd. 503 F.2d 359 (9th Cir. 1974). Furthermore, two Courts of Appeals which have considered this issue have declined to adopt an "automatic dividend rule." See Charles Schneider & Co. v. Commissioner,500 F. 2d 148, 153 (8th Cir. 1974), and Edwin's Inc. v. United States,501 F. 2d 675 (7th Cir. 1974). See also Rev. Rul. 79-8, I.R.B. 1979-2, page 6, in which the Commissioner has recently reled that deductions for reasonable compensation paid to shareholder-employees of a closely held corporation will not be denied on the sole ground that the corporation has not paid more than an insubstantial portion of its earnings as *525 dividends on its outstanding stock. In the instant case the evidence regarding the dividend history of petitioner, though relevant, is not conclusive. The Goldmans were undercompensated in prior years to permit the accumulation of needed corporate capital. Under such circumstances the absence of dividend history carries little weight. Respondent argues that much of the Goldmans' time was devoted to a multitude of business interests other than that of petitioner. This argument is not supported by the record which discloses that the Goldmans, on a combined basis, spent about 10 hours per week on other businesses. Accordingly, we hold that the amounts paid by petitioner to Marvin and Daniel Goldman during the taxable years ended June 30, 1974, and June 30, 1975, constitute reasonable compensation for services rendered and are therefore fully deductible as ordinary and necessary business expenses under section 162(a)(1). Decision will be entered for the petitioner.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated.↩
*. Includes compensation to Goldmans↩
2. Respondent had no witnesses and offered no expert testimony to support his adjustments to the Goldmans' salaries.↩