Overton Machine Company v. Commissioner.
Overton Mach. Co. v. Commissioner
Docket No. 24515.
United States Tax Court
1951 Tax Ct. Memo LEXIS 118; 10 T.C.M. (CCH) 810; T.C.M. (RIA) 51258; August 29, 1951
James H. Larva, Esq., for the petitioner. Philip J. Wolf, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion Respondent has determined deficiencies in petitioner's 1944 income tax, declared value excess profits tax, and excess profits tax liabilities in the amounts of $37.37, $11,538.81, and $63,187.59, respectively. Petitioner contests the deficiencies resulting from respondent's determination that only $40,000 of the $127,272.55 claimed as a deduction for compensation paid to its president represented reasonable compensation. Respondent has disallowed the excess. Findings of Fact The petitioner is a Michigan corporation incorporated in 1926 under the name of "American Machine Company", which name was changed to Overton Machine Company in 1944. *119 The petitioner filed its returns for 1944 with the Collector of Internal Revenue for the District of Michigan at Detroit, Michigan. It maintained its books of account and prepared its returns on the accrual basis of accounting. Petitioner is engaged in the business of manufacturing, assembling and selling drum drying machines used by the dairy industry for dehydrating milk and by the distillery industry for dehydrating distillers' slop. At all times petitioner's preferred stock was issued in the name of its president, Glen Overton, hereinafter referred to as Overton. At different times, some of the common stock was issued as qualifying shares to sons of Overton and to others unrelated to him. The balance of the common stock was issued to Overton. During the year 1944, Overton held approximately 90 per cent of the common stock. Overton was born in 1884. He studied agricultural engineering at an agricultural college in Michigan. Upon leaving college, he was employed in various dairy plants until 1910. From 1910 to 1926, he owned and operated creameries and milk products businesses. During the years 1926 to 1929, he perfected a drying cylinder to be used in a milk dehydrating *120 machine and obtained a patent in 1929. He paid the experimental and developing costs incurred in perfecting this cylinder. The petitioner was organized to construct and sell these machines. It enjoyed moderate success until 1930 when the price of milk was reduced. Overton experimented with the use of the machine in other industries but experienced no success until about 1937 when the machine was adapted to the drying of brewers' yeast. In 1937 or 1938, Overton purchased a small plant, hired mechanics, and experimented with the milk drying machine for the purpose of adapting it to dehydrating distillers' slop. He perfected modifications of the machine which rendered it adaptable to this new use. These modifications were patented by Overton. In 1941 and 1942 during the experiment, several of the drum drying machines were manufactured and sold to distillers. More machines were manufactured and sold in 1943 and 1944. During 1944, petitioners' gross sales of machines and parts to both the dairy and distillery industries totaled $892,225.48, of which $845,925.59 represented machine sales and the balance parts sales. Petitioner employed 60 persons in 1944. Overton was the dominant *121 personality in the petitioner's business. In addition to contacting customers and making sales, he made purchases, employed and trained personnel, engineered the construction of the machines according to specifications, and engineered the installation of machines in the purchasers' plants. During 1944, he had several conferences with all purchasers of the machines. Some of the sales in 1944 had their source in contacts Overton had made with distillery companies in 1942 and 1943. Manufacture and sale of the machines were delayed because of priority regulations. In 1926, the petitioner appointed a well-known manufacturer and seller of dairy equipment as the sole sales agent for its milk drying machines at a commission of 25 per cent of the selling price. On the same day, this agent contracted to pay Overton 15 per cent commission on all of petitioner's milk drying machines they sold in Wisconsin and Michigan, regardless of whether the sales were made by Overton personally or by a representative of the agent, and 10 per cent commission on petitioner's milk drying machines sold through his personal efforts anywhere outside of Wisconsin and Michigan. The agent also agreed to pay Overton *122 a commission of 10 per cent on all products manufactured by them and sold by him, and 40 per cent commission on all other products he sold for them, without territorial restrictions. Both contracts were to remain in effect 25 years. The agent was appointed by the petitioner because of the reputation and contacts it had with the dairy industry. Overton objected to the manner in which the contract between petitioner and agent was being fulfilled. He alone had made about 74 per cent of the agent's sales and, as to another 14 per cent, he had gone with the agent's representative to complete the sale. Modifications of the contract between Overton and the agent occurred on June 25, 1930. On December 31, 1931, a new contract was entered into between petitioner and the agent, and at the same time the prior contracts between the agent and petitioner and between the agent and Overton were cancelled. Under the terms of the contract, the exclusive agency theretofore granted was withdrawn and the agent was permitted to purchase the machines on a 10 per cent discount basis, except in some instances where the rate was 5 per cent. The agent was given the right to sell the milk drying machines *123 and "any drying equipment developed by the American Machine Company, Inc., or by Glen Overton, to be used outside of the Dairy industry". The contract was to remain in effect "from year to year from the date hereof subject to a notice of cancellation by any of the parties hereto given in writing to the others on the first day of October of any year." This contract remained in effect from the time it was entered into through the year in question. Overton was a party to the contract. A small percentage of petitioner's business was conducted through brokers who received the machines at 10 per cent below list price. They either assumed responsibility for the collection of the accounts or gave petitioner satisfactory paper in those instances where there was no credit risk. By a resolution of its board of directors dated January 2, 1931, petitioner approved as compensation to Overton "10 per cent on sales with a minimum salary of $5,000.00," provided, however, that any compensation in excess of $5,000 was not to be paid unless "the company has earned not less than 10 per cent on its capital stock and surplus". This method of compensation appeared to have been followed in the years 1931 *124 through 1933 but because of losses sustained during the depression years was abandoned in 1934 and 1935. Petitioner thereafter, in or about the year 1935, agreed to pay Overton a sum equal to 15 per cent of the selling price of all drum drying machines sold by him. This sum represented compensation for his services as president, sales manager, and salesman. The 15 per cent commission Overton received on his sales was the only remuneration he received for allowing petitioner to use his patents. Overton paid all sales and traveling expenses incurred by him in selling the machines. The agreement was not reduced to writing or evidenced by written minutes or resolution of the petitioner corporation. The agreement remained operative from the time it was put into effect through 1944. On December 2, 1946, Overton informed petitioner's board of directors that although he had not received compensation as an officer of the corporation for the past several years, he had instead received during those years a commission of 15 per cent on sales of drying machines and that from such commission he had paid all sales, traveling and other expenses incurred by him in connection with such sales. On *125 that date the board of directors formally approved the method of compensating Overton for his services during those years. Overton did not always receive by actual payment the entire 15 per cent due him. He drew what he needed for living expenses and at times left the remainder as a credit in his account. In 1944, petitioner claimed as a deduction $127,272.55 as compensation paid to Overton for services rendered in that year. This sum is equal to 15 per cent of the selling price of drum drying machines sold by Overton in that year. Petitioner paid $85,658.03 of this sum in 1944 to Overton in cash and in 1945 issued to him a note for $41,614.52, dated January 31, 1945, due July 31, 1945, with interest at 5 per cent. Overton did not report the $41,614.52 as income on his individual income tax return for the taxable year 1944. In 1945 petitioner paid the note. During 1944 it was customary for manufacturers of drum drying equipment to pay a commission of at least 15 per cent of the sales price to its selling agents who rendered similar sales and engineering services to those rendered by Overton. Petitioner paid no dividends from the date of its organization through the year 1944. *126 Pursuant to an agreement entered into in 1944, Overton sold to a third party his patents for $200,000 cash, plus an additional sum based on a percentage of sales and limited to $20,000. In addition, the third party agreed to employ Overton, at his option, either under a half-time employment arrangement or in an advisory or consultative capacity. The agreement further provided that upon the termination of Overton's employment (whether by death or otherwise) he or his legal representatives or assigns would receive a sum equal to 2 1/2 per cent of the third party's sales of drum drying machinery with a $5,000 yearly minimum until all patent rights acquired from Overton under the agreement expired. The third party was not obligated to pay the 2 1/2 per cent in the event its gross sales from the drum drying machinery were less than a specified minimum. The petitioner was also a party under this agreement. It sold to the third party patterns, designs, plans, the American Machine Company name, and files of the business of the manufacture and sale of drum drying machinery except those applicable to the milk drying machines, for $20,000 cash. Pursuant to the agreement, the third party allowed *127 petitioner to manufacture and sell for a specified period of time the patented drum drying machines in fulfillment of certain outstanding orders and proposals and for certain specified uses and purposes without payment of a royalty. In the year 1944, petitioner's milk drying machines sold for a price of approximately $11,400 to $12,000 each. In the same year, petitioner's machines, adapted to the drying of distillers' slop, sold for a price of approximately $13,000 to $14,000. The prices varied depending upon the accessories ordered by the purchasers. During the years 1941 through 1944, petitioner's sales (less returns and allowances), gross profit from sales, other income, deductions taken for Glen Overton's compensation, and net income, were as follows: Sales (Less
Deductions for
Returns and
Gross Profit
Other
Glen Overton's
Net
Allowances)
from Sales
Income
Compensation
Income
1941
$105,244.14
$ 32,485.25
$ 91.62
$ 6,327.59
$ 3,791.06
1942
285,201.54
70,335.74
1,146.79
14,061.79
11,856.52
1943
307,947.71
98,812.48
9,820.43
21,036.61
14,856.96
1944
888,945.92
271,867.74
8,072.09
127,272.55
52,493.16
Opinion
*128 ARUNDELL, Judge: The factual question before us is whether the sum of $127,272.55 paid to Overton as compensation for his services in 1944 was reasonable. [1] Overton received no salary as such but instead was paid a commission of 15 per cent of the sales price on the drum drying machines he sold. The commissions earned in 1944 totaled $127,272.55. Although the sum is larger than the amount paid in prior years, it is none-the-less a sum paid pursuant to a commission rate which had been established for a long period of time. Furthermore, the sum includes commissions on a backlog of sales that had their source in contacts Overton had made as far back as 1942. Because of priority regulations, the manufacture and sale of the machines had been delayed. We think petitioner *129 has submitted sufficient evidence to establish that a commission at the rate of 15 per cent was reasonable. It was customary for manufacturers and sellers of this type of machinery to pay a commission of at least 15 per cent to selling agents, who performed selling and engineering services similar to those performed by Overton. The sale of these machines was highly specialized and required considerable skill and effort. Before reaching the closing stages of a sale, it was necessary to work with the prospective customer's engineering staff, make engineering drawings, and do a considerable amount of costly plant layout work in order to make a presentation. It then took weeks and sometimes months before the sale was completed. The reasonableness of the commission paid to Overton is further indicated by the fact that it represented compensation for his services as president and manager as well as a commission for his selling efforts. The responsibilities and duties of Overton did not end with the completion of the sale. In addition to his administrative duties as president, he procured the materials, supervised building of the machines to see that they met specifications, and trained *130 engineers and mechanics to install and operate them. We think it is also noteworthy that Overton's only remuneration for the patents he allowed petitioner to use was the 15 per cent commission he received on his sales. No specified royalty was paid despite the fact that the patents were of considerable value, as is indicated by their sale in 1946 for a substantial sum of money. Under these circumstances, it is our view that the sum of $127,272.55 paid to Overton pursuant to the 15 per cent commission rate was reasonable compensation for his services in 1944 and deductible in full. Section 23(a), Internal Revenue Code. Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or Business Expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered * * *.↩