James D. KENNEDY, Jr. and Dorothy H. Kennedy, Petitioners-Appellants,

and

Cherokee Warehouses, Inc., Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

Nos. 80–1244, 80–1245.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 9, 1981.

Decided Feb. 4, 1982.

William L. Taylor, Jr., Fred H. Moore, Robert G. Russell, Spears, Moore, Rebman & Williams, Chattanooga, Tenn., for petitioners-appellants.

N. Jerold Cohen, Chief Counsel, I. R. S., M. Carr Ferguson, Asst. Atty. Gen., Michael L. Paup, Gary R. Allen, George L. Hastings, Jr., Tax Div., Dept. of Justice, Washington, D. C., for respondent-appellee.

Before WEICK * and JONES, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

WEICK, Circuit Judge.

Petitioners-Appellants have appealed from the decisions of the Tax Court finding them to be liable for deficiencies in their income tax returns for the taxable years 1973 and 1974. The Tax Court's decisions are reported at 72 T. C. 793 (1979).

In Appeal No. 80–1245, the issue before us is whether the entire amounts paid by

---

* Judge Weick became a Senior Circuit Judge at the close of business on December 31, 1981.

appellant Cherokee Warehouses, Inc. to James D. Kennedy, Jr. during its fiscal years ending July 31, 1973 and July 31, 1974 are deductible as reasonable compensation under I. R. C. section 162(a)(1). The Tax Court held that they are not. We disagree.

In Appeal No. 80–1244, the issue is whether all of the compensation paid by Cherokee Warehouses to appellant James D. Kennedy, Jr. during the calendar year 1973 qualifies as earned income for maximum tax purposes under former I. R. C. section 1348. The Tax Court held that it does not. We disagree.

At issue in the appeals is the propriety of the application by the Commissioner of Internal Revenue and the Tax Court of Sections 162(a)(1) and 1348 to an Incentive Compensation Agreement entered into in 1950 by taxpayer James D. Kennedy, Jr. and his employer, Cherokee Warehouses, Inc., which was in operation and fully performed from 1951 to and including the tax years in question 1973 and 1974, with the results shown in footnotes 1 and 2, appended hereto.

Such an agreement was authorized by the Code of Federal Regulations, 26 C.F.R. § 1.162–7(b)(2)(3).

The last sentence in (3) expressly states the circumstances to be taken into consideration in determining the reasonableness of the compensation.

"The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract was questioned." In all the years the contract was in effect, it was not questioned until the tax years 1973 and 1974, over a period of about 22 years. Prior to the Incentive Compensation Agreement, the operations of the predecessor of Cherokee were not successful. It is obvious that neither the Commissioner nor the Tax Court appropriately took into consideration the admonition in the last sentence of (3). In essence, what the Tax Court did was approximately to split the difference between the Commissioner's and the taxpayer's figures. We disagree and reverse for the reasons hereinafter set forth.

## I

### Facts

Petitioner-appellant Cherokee Warehouses, Inc. (Cherokee) is a closely held corporation in Chattanooga, Tennessee. It operates several warehouses where it stores merchandise primarily for large distributors and manufacturers for later distribution in the Chattanooga area and throughout the southeastern part of the country. Petitioner-appellant James D. Kennedy, Jr. (Kennedy, Jr.) is an officer and stockholder of Cherokee. His wife Dorothy is a party only because she signed and filed a joint return with her husband; she is not involved in her husband's company. During the years in issue, 1973 and 1974, Kennedy, Jr. was the Secretary-Treasurer and General Manager of Cherokee. Originally he owned only one share of stock and later he owned 7.84 percent of the stock in his own name, and another 6.60 percent as trustee for his sister. The balance of the stock, 85.56 percent, was owned by his father, James D. Kennedy, Sr.

Cherokee is the corporate successor of a partnership composed of Kennedy, Jr.'s brother-in-law, Samuel R. Smartt, and Kennedy, Sr. This partnership was formed in late 1947, utilizing some vacant manufacturing buildings which were owned by the elder Kennedy. The partnership was not successful. In Kennedy, Sr.'s opinion, Smartt was an excellent salesman but a poor administrator and Mr. Kennedy decided that their business relationship would have to be changed. The result of that decision was the formation of Cherokee.

At that time, 1950, Kennedy, Jr. was employed at a Chattanooga bank, where he had been assured that he had a promising future. However, he decided to give up that potential career and go into Cherokee with his father and Smartt because he wanted to run his own business.

All of the initial capital of $25,000 was contributed by Kennedy, Sr., who also owned 248 of the original 250 shares of $100

par value stock. Kennedy, Jr. and Smartt owned one share apiece. Kennedy, Sr. became President of the corporation, but it was agreed that he would not be involved in the day-to-day operation of the company. His role was limited to supplying financial backing and furnishing the buildings, which were leased to Cherokee. The operation of the business was to be handled by Smartt and Kennedy, Jr., who became Vice President and Secretary-Treasurer, respectively. These three were Cherokee's only employees in its fledgling days, although by 1973 it had grown to employ some 200 people.

A key aspect of Cherokee's formation, and one which is central to the decision in this case, was the incentive compensation plan which was developed for Smartt and Kennedy, Jr. Kennedy, Sr. did not want to burden the new corporation with large fixed salaries for the two officers, since the whole venture was a risky undertaking at the time. Moreover, from his business experience over the years he had come to believe in the value of incentive compensation in order to motivate employees. Accordingly, the parties negotiated and entered into an incentive compensation agreement in 1950 whereby Kennedy, Jr. and Smartt each received a small fixed salary of $400 per month, with the bulk of their compensation contingent upon profits. In addition to the monthly salary, each was to receive a monthly bonus of 20 percent of the excess of gross receipts over 1⅛ times the monthly operating expenses, and an annual bonus of 10 percent of the excess of gross receipts over 1⅛ times the annual operating expenses.[1] The salaries were included in the operating expenses in determining the monthly bonuses, and salaries and monthly bonuses were both counted as expenses in determining the annual bonus. The net result of this agreement was that Smartt and Kennedy, Jr. each would receive 26 percent of the net profits of Cherokee, while Cherokee received the remaining 48 percent. Kennedy, Sr. received the same basic salary, increased to $750 per month in 1954, but no incentive compensation.

Gradually, Kennedy, Jr. and Smartt built the corporation up into a going concern. During the early years, they put in long hours and worked in all phases of the business, from manual labor to management. Since Cherokee was a new company facing well-established competition, much of their time was spent soliciting customers. By the mid-fifties the business had begun to take off; new buildings were constructed, and additions were made to existing buildings. Kennedy, Jr. acted as general contractor for this construction in order to reduce expenses.

Sam Smartt died in 1964, and Kennedy, Jr. took over the duties as General Manager. To compensate for the added responsibility, the incentive compensation agreement was modified in August of that year. Kennedy's monthly salary was set at $1000 per month (increased to $1100 per month on August 1, 1973). The monthly incentive compensation was raised from 20 percent to 25 percent of net profits, and the annual bonus was increased from 10 percent to 12½ percent of net profits. The result of this adjustment was that Kennedy, Jr.'s share of the profits increased from 26 percent to 34.375 percent, and Cherokee's share increased from 48 percent to 65.625 percent.

Cherokee is an authorized dealer for Allis-Chalmers forklift trucks. This line of business constitutes the Material Handling Division of Cherokee. The managers of this division are also compensated on an incentive basis consisting of a salary plus 20 percent of the profits of the division.

In 1964, when Kennedy, Jr. took over as General Manager, Cherokee had only 38 employees. By 1973–74, this number had grown to 200 employees. During the years in issue, Kennedy, Jr. was a full-time employee of Cherokee, usually working 40–50 hours per week. His responsibilities included solicitation of new accounts and maintenance of relations with existing customers;

---

1. The use of the fraction, to provide a reserve against losses, was abandoned after March 1951 for both monthly and annual bonuses, since the corporation had begun to show a profit by then.

pricing and negotiation of rates; recruiting, hiring, and training of key employees; supervision of daily warehouse activity; management of receivables, payables, and major purchases; and formulation of corporate growth strategy. More detailed matters, such as daily warehouse operations, building maintenance, bookkeeping, and material handling, were controlled by five supervisors who reported directly to him.

The principal thrust of Cherokee's business has been the servicing of large accounts requiring large commitments of space. Although some of the supervisors assisted Kennedy, Jr. in soliciting new accounts, that has always been primarily his responsibility, and he has been quite successful at it. Over the years he has obtained for Cherokee the business of such companies as DuPont, Monsanto, UniRoyal, Goodyear, Union Carbide, Carnation, General Mills, Pillsbury, and Winn-Dixie.

Since 1964, Kennedy, Jr. has devoted a considerable amount of time to warehouse trade association activities and publications. He has been successively Treasurer, Second Vice President, First Vice President, and President and Chairman of the Board (in 1972–73) of the Southeastern Warehousemen's and Movers' Association. His activities in that organization included participation in seminars and conventions, chairing committees and panels, and writing articles for presentation to the membership. In 1976–77 he served as Chairman of the Board of the American Warehousemen's Association. On several occasions he has made speeches and presented papers before the National Council of Physical Distribution Management, an organization of traffic managers for large manufacturers and distributors. He has also conducted seminars in distribution management at Ohio State University and Michigan State University, and has published many articles in warehousing trade journals. In 1961 he took an active role in supporting the passage of a Tennessee statute which excludes merchandise in transit from state *ad valorem* taxes. This statute has helped Cherokee by making warehousing in Tennessee, and especially in cities near state lines such as Chattanooga, more competitive with that in neighboring states.

Kennedy, Jr. has also been active in civic affairs. In 1973 he was chairman of the local chapter of the American Red Cross. During 1973 and 1974 he served as Commissioner of Fire and Police in Lookout Mountain, Tennessee, where he resides; was on the advisory committee of the Industrial Committee of One Hundred; was active in the Chattanooga Chamber of Commerce; was a member of the Board of Directors of the United Fund and the American Cancer Society; and served on a committee of the local Rotary Club. In 1974, he became a member of the Board of Trustees of the Girls' Preparatory School of Chattanooga.

During the tax years in issue, ending July 31, 1973 and July 31, 1974, Kennedy, Jr. received as total compensation from Cherokee Warehouses the sums of $332,365.68 and $301,345.00 respectively.[2] These

2. Cherokee's gross receipts, net income, net worth, compensation paid to Smartt and Kennedy, Jr., and Kennedy, Jr.'s incentive compensation for fiscal years 1951 through 1974 are as follows:

| FYE July 31 | Gross Receipts | Net Income | Net Worth | Smartt | Kennedy, Jr. | Incentive Portion of Kennedy, Jr.'s income |
|---|---|---|---|---|---|---|
| 1951 | $ 58,567 | $ 2,686 | $ 26,686 | $ 6,255 | $ 6,255 | $ 1,455 |
| 1952 | 144,670 | 29,419 | 45,310 | 18,433 | 18,433 | 13,633 |
| 1953 | 408,752 | 78,042 | 76,461 | 49,072 | 49,072 | 44,272 |
| 1954 | 208,376 | 22,520 | 86,704 | 19,260 | 19,260 | 10,260 |
| 1955 | 233,388 | 26,422 | 108,807 | 23,350 | 23,350 | 14,350 |
| 1956 | 315,630 | 37,846 | 132,964 | 29,139 | 29,139 | 20,139 |
| 1957 | 346,784 | 52,303 | 163,181 | 37,738 | 37,738 | 28,738 |
| 1958 | 331,273 | 38,254 | 186,615 | 33,258 | 33,258 | 24,258 |

amounts represent total compensation paid, since Cherokee has no pension or profit sharing plans for its employees. By comparison, the next two ranking officers of Cherokee, two vice presidents who handled day-to-day operations, were paid $23,740.00 and $25,060.00 for the fiscal year ending (FYE) July 31, 1973, and $26,660.00 and $28,190.00 for FYE July 31, 1974. Kennedy, Jr. has no agreement with his father relative to acquiring future ownership of Cherokee, nor does he have any stock option agreements with Cherokee. Cherokee has paid only one cash dividend since its inception, in 1953. During the tax years in issue, Kennedy, Jr. and Kennedy, Sr. owned all of the stock in five other warehouse companies. However, Kennedy, Jr. is not involved in the management of these other companies, and receives no compensation from them.

The Commissioner determined that reasonable compensation for Kennedy, Jr. would have been $108,000 for FYE July 31, 1973 and $120,000 for FYE July 31, 1974, and that amounts in excess of that were unreasonable and not deductible under Internal Revenue Code (I. R. C.) section 162(a)(1). The Commissioner further determined that such excess amounts were not earned income for maximum tax purposes within the meaning of I. R. C. section 1348. Consequently, the Commissioner assessed deficiencies of $14,822.30 for calendar year

1973 against Kennedy, Jr. and his wife, and $108,271.53 and $87,862.04 for FYE July 31, 1973 and July 31, 1974 respectively against Cherokee. The appellants petitioned the Tax Court for a redetermination of the deficiencies.

The Tax Court found that reasonable compensation to Kennedy, Jr. would have been $190,000 for FYE July 31, 1973 and $220,000 for FYE July 31, 1974. It based this decision primarily on the conclusion that Kennedy, Jr. was no longer indispensable to the operation of Cherokee now that the company was an established success, and that circumstances had changed sufficiently since 1950 to make the incentive compensation agreement no longer reasonable. The court cited the large disparity between Kennedy, Jr.'s compensation and that of the corporation's next-ranking officers as evidence of excessiveness, stating that it could not be justified by his value to the company because he was no longer the "guiding genius" of Cherokee. The court also found that Kennedy, Jr.'s civic and trade association activities were not of such benefit to Cherokee as to warrant the amounts paid to him.

The court further held that the portion of Kennedy, Jr.'s compensation found to be unreasonable was not earned income and thus not qualified to receive maximum tax treatment under section 1348. It redeter-

| FYE July 31 | Gross Receipts | Net Income | Net Worth | Smartt | Kennedy, Jr. | Incentive Portion of Kennedy, Jr.'s income |
|---|---|---|---|---|---|---|
| 1959 | 279,653 | 21,558 | 201,238 | 22,389 | 22,389 | 20,904 |
| 1960 | 353,994 | 37,678 | 226,774 | 41,782 | 41,782 | 32,782 |
| 1961 | 439,851 | 50,154 | 255,154 | 47,252 | 47,252 | 38,252 |
| 1962 | 410,017 | 27,773 | 274,255 | 34,877 | 34,877 | 25,877 |
| 1963 | 517,330 | 65,327 | 312,776 | 48,471 | 48,471 | 39,471 |
| 1964 | 542,978 | 58,298 | 376,103 | 44,382 | 44,382 | 35,382 |
| 1965 | 588,520 | 96,684 | 428,385 | — | 64,334 | 52,234 |
| 1966 | 802,850 | 128,137 | 502,949 | — | 82,392 | 70,392 |
| 1967 | 1,057,228 | 198,754 | 611,683 | — | 115,479 | 103,479 |
| 1968 | 1,042,158 | 175,969 | 703,367 | — | 102,581 | 90,581 |
| 1969 | 1,335,779 | 239,939 | 824,181 | — | 136,428 | 124,428 |
| 1970 | 1,960,445 | 353,754 | 1,000,756 | — | 189,831 | 177,831 |
| 1971 | 2,058,033 | 367,184 | 1,193,709 | — | 206,024 | 194,024 |
| 1972 | 2,615,051 | 559,866 | 1,496,549 | — | 309,775 | 297,775 |
| 1973 | 3,655,696 | 739,253 | 1,919,457 | — | 332,366 | 320,366 |
| 1974 | 4,208,633 | 631,428 | 2,267,030 | — | 301,345 | 288,645 |

There is an unexplained discrepancy in Kennedy, Jr.'s figures for the year 1959.

mined the deficiencies as $9,344.86 for the Kennedys for the calendar year 1973 and $68,911.53 for FYE July 31, 1973 and $39,-862.04 for FYE July 31, 1974 for Cherokee.

The taxpayers have appealed that decision to this court.

## II

### Reasonable Compensation Issue

#### A

Our starting point is the Code, in this case I. R. C. section 162(a)(1):

§ 162. Trade or business expenses.

(a) In general. There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

> (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; . . . .

This is amplified in the Code of Federal Regulations, 26 C. F. R. § 1.162–7(a)(b)(2)(3):

§ 1.162–7 *Compensation for Personal Services.*

(a) There may be included among the ordinary and necessary expenses paid or incurred in carrying on any trade or business a reasonable allowance for salaries or other compensation for personal services actually rendered. The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services.

(b) The test set forth in paragraph (a) of this section and its practical application may be further stated and illustrated as follows:

> .    .    .    .    .

> (2) . . . Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the

services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. (3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned.

■ Reasonableness of salaries paid to corporate officers is ordinarily a question of fact. *Capitol-Barg Dry Cleaning Co. v. Commissioner*, 131 F.2d 712 (6th Cir. 1942). In determining reasonableness, many variables are considered, and no single factor is decisive. *Mayson Manufacturing Co. v. Commissioner*, 178 F.2d 115 (6th Cir. 1949). Indeed, it has been said that "[t]he determination of reasonable compensation under Section 162(a)(1) of the Internal Revenue Code is more nearly an art than a science." Bertozzi, *Compensation Policy for the Closely-held Corporation: The Constraint of Reasonableness*, 16 Am.Bus.L.J. 157, 186 (1978). Each case is governed by its own facts or, as it has been more colorfully put, "each corporate tub must more or less stand upon its own bottom." *Miller Manufacturing Co. v. Commissioner*, 149 F.2d 421, 423 (4th Cir. 1945).

■ Some of the major factors to be considered were enumerated by this court in *Mayson Manufacturing Co. v. Commissioner, supra* : the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the corporation's gross and net income; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small

corporations with a limited number of officers, the amount of compensation paid to the particular employee in previous years.

Among other factors which courts have taken into account when considering this question are the success of the employee's efforts; profitability of the business; absence of the usual fringe benefits such as a pension or profit sharing plan, stock options, etc. which are available to executives of other companies of comparable size; unusual capability of employees; and bonuses not paid in the same ratio as stock holdings. 33 Am.Jur.2d *1981 Federal Taxation* ¶ 3133 (1981). *See generally* Annot., 10 A.L.R.3d 125 (1966); Ford & Page, *Reasonable Compensation: Continuous Controversy*, 5 J.Corp.Tax. 307 (1979); Bertozzi, *Compensation Policy for the Closely-held Corporation, supra. See also* Comment, *Unreasonable Compensation in the Professional Corporation*, 13 Akron L.Rev. 540 (1980).

■ An incentive compensation agreement is to be judged by the circumstances existing at the time the agreement was made, not the time it is questioned. 26 C.F.R. § 1.162–7(b)(2). If it is the product of a free, arm's length bargain, contingent compensation should be allowed as a deduction even though such compensation proves to be more than might otherwise have been paid. *Robert Rogers, Inc. v. United States*, 93 F.Supp. 1014 (Ct.Cl.1950).

■ Since reasonableness of compensation is a question of fact, a lower court's decision cannot be set aside unless it is found to be clearly erroneous. *Commissioner v. Duberstein*, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *United States v. United States Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

In the instant case, we have such a conviction.

## B

■ In the present case, Kennedy, Jr.'s compensation was high, but the agreement was fair when entered into. No one in 1950 could have foreseen that Cherokee would prove to be so successful. The partnership which preceded Cherokee had proved to be a losing proposition and Cherokee's own prospects were no better, yet Kennedy, Jr. gave up a promising career at the bank in order to go with Cherokee. At that time, Kennedy, Jr. only owned one share of stock in Cherokee; the other 99 percent was owned by Kennedy, Sr. Therefore, even though any success of Cherokee would be due to the efforts of Kennedy, Jr. and Smartt, most of the benefit would inure to Kennedy, Sr., who was assured of the best efforts of both men on behalf of his company. The courts have recognized that an arrangement whereby officers' salaries are conditioned on annual earnings may tend to stimulate activity. *Cohn v. United States*, 52 A.F.T.R. 1298 (W.D.Tenn.1957), *aff'd on other grounds*, 259 F.2d 371 (6th Cir. 1958); *William S. Gray & Co. v. United States*, 35 F.2d 968 (Ct.Cl.1925). Nor was there any provision for Kennedy, Jr. to purchase more shares in the future or to assume ownership from his father at a later date. On the other hand, Kennedy, Jr. had the promise that the more successful he could make the business, the more he would make for himself. It seems clear, then, that both parties benefited from the original incentive agreement, and that it was not a one-sided bargain.

The 1964 modification of the agreement after Smartt's death, in which Kennedy, Jr.'s compensation was increased, was also fair and advantageous to Cherokee. While Kennedy, Jr. assumed Smartt's duties, thus sparing the company the necessity of hiring and training another employee, he did not succeed to Smartt's share of the profits. As can be seen from the table in footnote two, *supra*, if Kennedy, Jr. had received all of Smartt's incentive compensation, he would have received $2,601,748 from 1965 through the years in issue. In actuality, he received $1,719,748 a saving to the corporation of about $880,000. Kennedy, Jr.'s

share of the profits went from 26 percent to 34.375 percent, an increase of about a third; but Cherokee's share of the profits increased by over 36 percent, from 48 percent to 65.625 percent.

The Commissioner argues, in effect, that the mere existence of a family relationship between the two Kennedys is prima facie evidence that the compensation agreement was not the product of an arm's length bargain. While it is true that such a relationship invites careful scrutiny, *see Capitol-Barg Dry Cleaning Co. v. Commissioner, supra,* nevertheless there is no per se rule against such agreements. Contingent compensation in a family corporation will be upheld if it was set up when the business started, or when the amount of future earnings was questionable, and has been consistently followed through the ups and downs of the business. *Mayson Manufacturing Co. v. Commissioner, supra; Liberty National Bank & Trust Co. v. United States,* 67–1 U.S.T.C. (CCH) ¶ 9361 (W.D.Ky.1967); *Overton Machine Co.,* 10 T.C.M. (CCH) 810 (1951). An agreement between family members in a close corporation must be evaluated in light of all the circumstances, and if the circumstances show that the agreement is fair to the corporation, it will be upheld. *See, e.g., Home Interiors & Gifts, Inc.,* 73 T.C. 1142 (1980); *Levenson & Klein, Inc.,* 67 T.C. 694 (1977); *Gordy Tire Co. v. United States,* 181 Ct.Cl. 713, 296 F.2d 476 (Ct.Cl.1961); *Charles Balazick,* 14 T.C.M. (CCH) 123 (1955); *Dorzback v. Collison,* 93 F.Supp. 935 (D.Del.1950).

The agreement in the instant case meets the above requirements. The evidence shows that, while Kennedy, Jr. profited from the 1964 modification, Cherokee benefited even more.

It is significant to note that the incentive compensation plan herein was not challenged by the Commissioner in the early days of the company when it produced little income. It is only now, after Cherokee has become successful and the plan is yielding large amounts, that it is questioned.

Generally, contingent compensation is expected to be larger than compensation that is fixed and definite. It would not seem to be an unreasonable business practice for an employer to recognize and reward sacrifices made by employees in the hard, formative days by granting a more generous compensation in the days that are lush.

*Commercial Iron Works v. Commissioner,* 166 F.2d 221, 224 (5th Cir. 1948).

■ High compensation is more reasonable when there is a corresponding lack of fringe benefits such as pension plans or stock options which might normally be expected. *See Paramount Clothing Co., Inc.,* 38 T.C.M. (CCH) 261 (1979); *Levenson & Klein, Inc., supra.* In the present case, Kennedy, Jr. has no stock options, pension plan, or other fringe benefits.

■ One factor which is indicative of a distribution of capital rather than compensation is if the payments are in proportion to the employee's stockholdings. *Paul E. Kummer Realty Co. v. Commissioner,* 511 F.2d 313 (8th Cir. 1975); *William Yuenger Manufacturing Co., Inc. v. United States,* 52 A.F.T.R. 1855 (N.D.Ill.1957). That is not the situation here. During the tax years in question Kennedy, Jr. owned less than 8 percent of Cherokee's stock, while receiving 34.375 percent of the profits through the incentive compensation plan. Where compensation paid to officers bears no relation to stockholdings, it tends to show that amounts paid were actually compensation and not disguised dividends. *Berkshire Oil Co.,* 9 T.C. 903 (1947); *Soabar Co.,* 7 T.C. 89 (1946); *cf. Nor-Cal Adjusters v. Commissioner,* 503 F.2d 359 (9th Cir. 1974) (compensation in exact proportion to stockholdings found to be dividends).

Moreover, during the years in question, Kennedy's personal tax bracket was higher than Cherokee's (50 percent versus 48 percent). Thus, the incentive compensation plan cannot be considered a device for reducing tax exposure. *See Commercial Iron Works v. Commissioner, supra; Ray Waits Motors, Inc. v. United States,* 145 F.Supp. 269 (E.D.S.C.1956).

It is true that non-payment of dividends by a close corporation is a factor which may indicate that compensation is unreasonable, and Cherokee's only dividend was in 1953. However, that alone is not determinative, and courts have found compensation to be reasonable even in cases where no dividends were ever paid. *See, e.g., Paramount Clothing Co., Inc., supra.* There are a variety of business reasons for not paying dividends and we believe, as did the *Paramount Clothing* court, that under the present circumstances the absence of dividends carries little weight.

■ The employee's qualifications or unusual capability, the extent of his responsibilities, and the result achieved are also important factors to be considered. *Roth Office Equipment Co. v. Gallagher,* 172 F.2d 452 (6th Cir. 1949); *Patton v. Commissioner,* 168 F.2d 28 (6th Cir. 1948); *Boyd Construction Co. v. United States,* 339 F.2d 620 (Ct.Cl.1964). The Tax Court considered that Kennedy, Jr.'s services were no longer crucial to Cherokee's continued success, pointing particularly to the fact that Cherokee now has many employees and much of the day-to-day operations is now handled by subordinates. We think that conclusion is erroneous. The fact that supervision of daily operations is delegated to several subordinates does not make Kennedy, Jr. less valuable to the corporation; any successful executive must delegate responsibility.

As mentioned earlier, Kennedy, Jr.'s responsibilities during the years in issue covered a wide range of activities, including sales, personnel, operations, finance, and planning. Getting and keeping customers is, of course, the lifeblood of any business, and this is Kennedy, Jr.'s responsibility at Cherokee. He was solely responsible for the solicitation of every major customer of Cherokee, and for maintaining relations with them afterward. Although Kennedy, Sr. is the president of the corporation, he has never taken an active role in its management and he testified that, to this day, he knows nothing about the warehouse business because it has always been run by his son. The record shows that no other

officer of Cherokee has the experience with the company which Kennedy, Jr. has, in either length of service or breadth of activities. If Cherokee were to lose his services it would be in a difficult position until a suitable replacement could be found.

By any reasonable measure, Kennedy, Jr.'s efforts on behalf of Cherokee have been resoundingly successful. From being a newcomer in the business facing several well-established competitors, Cherokee has gone on to become the leading warehouse company in Chattanooga. The financial table reproduced in footnote two, *supra,* shows that, since Kennedy, Jr. assumed the position of General Manager in 1964, Cherokee's gross receipts have increased almost eight times, net income has increased nearly eleven times, and net worth has shown an increase of over six times. *Cf. National Cottonseed Products Corp. v. Commissioner,* 76 F.2d 839 (6th Cir. 1935) (poor performance did not justify compensation paid).

We believe that the trial court unduly discounted the value to Cherokee of Kennedy, Jr.'s trade and civic duties. The trade association activities broadened Kennedy, Jr.'s knowledge of the warehousing business and enabled him to keep abreast of developments in the industry. This was an obvious benefit to Cherokee, since it profited from Kennedy, Jr.'s improved expertise. *Levenson & Keith, Inc., supra; see Schaefer Klaussmann Co., Inc.,* 4 T.C.M. (CCH) 526 (1945). These activities also made Cherokee's name known regionally and nationally in the trade and among warehousing customers, which was also a benefit to Cherokee.

Similarly, the trial court gave too little weight to Kennedy, Jr.'s civic and charitable activities. While the benefit to Cherokee is not as direct as in the case of the trade association activities, it is not insubstantial. Since half of Cherokee's business is local, Kennedy, Jr.'s prominence in local affairs tended to increase Cherokee's reputation in the local business community. It might also be inferred that national corporations, too, prefer to do business with concerns which are well-regarded in their local areas.

The figures arrived at by both the I. R. S. and the Tax Court appear to be purely arbitrary:

|                    | 1973        | 1974        |
|--------------------|-------------|-------------|
| Actual compensation | $332,365.68 | $301,345.00 |
| Tax Court allowance | 190,000.00  | 220,000.00  |
| I.R.S. allowance    | 108,000.00  | 120,000.00  |

It seems evident that the lower court merely split the difference between the taxpayer's and Commissioner's figures and there is no more justification for one figure than the other.

We find that the compensation paid to Kennedy, Jr. during the years in issue was reasonable. Accordingly, we hold that the decision of the Tax Court in Appeal No. 80–1245 is not supported by substantial evidence and is therefore clearly erroneous. The judgment is reversed and the cause is remanded with instructions to permit the taxpayer to deduct the full amount of the compensation paid to James D. Kennedy, Jr. during tax years 1973 and 1974.

## III

### Earned Income Issue

Appeal No. 80–1244 concerns the treatment of that same compensation on the personal income tax return of James D. Kennedy, Jr. and Dorothy Kennedy for calendar year 1973.

At the time in question, I. R. C. section 1348 (repealed 1981) provided that certain "earned income" would be taxed at a maximum rate of 50 percent, even though the taxpayers might be in a tax bracket requiring a higher tax rate on other forms of income. Section 1348(b) incorporated by reference the definition of earned income found in section 911(b). In turn, section 911(b) of the Code defines "earned income" as follows:

(b) *Definition of earned income.*—For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered....

The taxpayers computed their tax liability on the basis that Kennedy, Jr.'s compensation from Cherokee qualified for maximum tax treatment under section 1348. The Commissioner differed, ruling that $213,365.68 of the compensation received by Kennedy, Jr. during that calendar year was not reasonable compensation and therefore did not qualify as earned income. The Tax Court agreed, holding that the portion of the compensation found to be unreasonable in Cherokee's case constituted a distribution of profits to Kennedy, Jr., i.e. dividends, and thus did not qualify for maximum tax treatment under section 1348 in the Kennedys' case.

Since we have found that the entire amount paid to Kennedy, Jr. by Cherokee constituted reasonable compensation under section 162(a)(1), it follows that the entire amount qualifies as earned income under section 911(b) and is entitled to maximum tax treatment under section 1348.

Accordingly, the judgment of the Tax Court in Appeal No. 80–1244 is reversed and the cause is remanded with instructions to permit the taxpayers to claim the entire amount received from Cherokee during calendar year 1973 as earned income.

Judgments reversed.