T.C. Memo. 1997-300


UNITED STATES TAX COURT


O.S.C. & ASSOCIATES, INC. d.b.a.
OLYMPIC SCREEN CRAFTS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 3522-95.               Filed June 30, 1997.


<u>Daniel L. Casas</u>, <u>Diana T. Gendotti</u>, and <u>Sheila M. Riley</u>, for petitioner.

<u>Paul J. Krug</u> and <u>Virginia J. Coffre</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

FOLEY, <u>Judge</u>:  By notice of deficiency dated December 5, 1994, respondent determined the following deficiencies and accuracy-related penalties:

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|----------------------|
| 1990 | $130,182  | $26,036  |
| 1991 | 544,877   | 108,975  |
| 1992 | 413,649   | 82,730   |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues we must decide are as follows:

1. Whether petitioner, pursuant to section 162, is entitled to deduct certain compensation payments to shareholders in amounts in excess of the amounts determined by respondent. We hold that petitioner is not so entitled.

2. Whether petitioner, pursuant to section 6662(a), is liable for accuracy-related penalties for negligence. We hold that petitioner is liable.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. O.S.C. & Associates, Inc. d.b.a. Olympic Screen Crafts was incorporated under California law in 1982. During the years in issue, petitioner's principal place of business was in Fremont, California. Allen Blazick is petitioner's chief executive officer, Janette Blazick (Allen Blazick's wife) is petitioner's

secretary and treasurer, and Steven Richter (Mrs. Blazick's brother) is petitioner's vice president. Together the three constituted petitioner's board of directors.

Mr. Blazick is a resident of Fremont, California. He attended Armstrong College, where he received a bachelor's degree in business management and a master's degree in business administration. In January of 1970, while attending college, he purchased a silk-screen printing business. From 1970 through 1972, he and his wife, Janette, conducted the business from their residence. He had no previous experience in the printing business but learned quickly. In 1982, Mr. Blazick incorporated the business under the name "O.S.C. & Associates, Inc." During the years in issue, Mr. Blazick owned 90 percent of petitioner's stock and Mr. Richter owned 10 percent. Mr. Blazick expanded the business to include numerous printing processes and other services. During the years in issue, petitioner employed between 179 and 235 employees, including numerous managerial and supervisory personnel.

Leo Rosi was petitioner's accountant. Messrs. Rosi and Blazick were classmates at Armstrong College, and in the late 1970's, Mr. Blazick became Mr. Rosi's client. In 1988 or 1989, Mr. Rosi advised Messrs. Blazick and Richter that petitioner should pay dividends. Their response to Mr. Rosi's advice discouraged Mr. Rosi from raising the issue in subsequent years. Petitioner has never declared or paid dividends.

In 1985, Mr. Rosi drafted an incentive compensation plan (the plan), applicable only to Messrs. Blazick and Richter, which was approved by the board of directors on October 7, 1985. The plan provided for the payment, after the close of the fiscal year, of compensation in cash and/or promissory notes.

Pursuant to the terms of the plan, the first step is to calculate the "Adjusted Industry Gross Margin". The adjusted industry gross margin, or hypothetical gross profit, is the gross profit petitioner would have made on its sales if its gross profit margin had equaled the printing industry's average gross profit margin (i.e., petitioner's sales x industry average gross profit percentage = hypothetical gross profit). This hypothetical gross profit is then compared to petitioner's actual gross profit for the year. The amount by which petitioner's actual gross profit exceeds the hypothetical gross profit constitutes the incentive compensation pool. The plan allocates the incentive compensation pool to Messrs. Blazick and Richter "According to Stock Ownership" (i.e., 90 percent to Mr. Blazick and 10 percent to Mr. Richter).

Under the plan, each allocation is reduced if certain contingencies occur. Mr. Blazick's allocation is reduced by inventory shortages in excess of $100,000 and by bad debts. Mr. Richter's allocation is reduced by inventory spoilage in excess of $100,000 and production rerun costs in excess of $100,000.

Petitioner operated on a fiscal year ending on October 31.
Petitioner's financial statements for the years in issue
delineated the following figures:

FYE 1990

| | |
|---|---|
| Sales/revenue | $10,271,148.12 |
| Cost of goods sold | (5,978,195.24) |
| Gross profit | 4,292,952.88 |
| Net income | 192,865.38 |
| Yearend net worth | 194,490.31 |

FYE 1991

| | |
|---|---|
| Sales/revenue | $13,115,588.55 |
| Cost of goods sold | (7,324,963.44) |
| Gross profit | 5,790,625.11 |
| Net income | 134,160.16 |
| Yearend net worth | 328,650.47 |

FYE 1992

| | |
|---|---|
| Sales/revenue | $12,310,770.53 |
| Cost of goods sold | (5,981,916.36) |
| Gross profit | 6,328,854.17 |
| Net income | 143,809.07 |
| Yearend net worth | 472,459.54 |

Mr. Rosi calculated the compensation due under the plan.  In
calculating the compensation, he referred to information
published annually in a survey of small businesses (the Survey).
For the 1990 calculation, he used 32.189 percent as the industry
average gross profit margin.  For that year, the Survey reported

a 34.93-percent industry average.  For the 1991 calculation, he
again used the 1990 industry average (i.e., 32.189 percent)
rather than the 1991 industry average.  In the 1990 and 1991
calculations, he used figures from a sample of printing companies
categorized according to the amount of their sales.  In 1992,
however, he used figures from a sample of printing companies
categorized according to the value of their assets.  In addition,
he used a chart applicable to companies with assets under $1
million when petitioner had assets in excess of that amount.
Also in 1992, petitioner incurred bad debts of $166,700.  Before
adjusting Mr. Blazick's allocation, however, Mr. Rosi reduced the
bad debts figure to $112,403.

During the years in issue, petitioner paid, in the form of
cash and promissory notes, the following amounts to Messrs.
Blazick and Richter:

|  | 1990 | 1991 | 1992 |
|---|---|---|---|
| Allen Blazick |  |  |  |
| Salary | $155,372.00 | $175,845.00 | $173,372 |
| Incentive | 490,859.92 | 1,651,145.76 | 1,324,608 |
| Total | 646,231.92 | 1,826,990.76 | 1,497,980 |
| Steven Richter |  |  |  |
| Salary | $57,791.00 | $64,616.00 | $60,000 |
| Incentive | 98,035.62 | 183,460.64 | 149,179 |
| Total | 155,826.62 | 248,076.64 | 209,179 |

For each year in issue, petitioner filed a Form 1120 (U.S.
Corporation Income Tax Return) and claimed a deduction for the
compensation paid to Messrs. Blazick and Richter.  Respondent, in
the notice of deficiency, disallowed $357,453 of petitioner's

1990 deduction, $1,580,631 of petitioner's 1991 deduction, and $1,198,677 of petitioner's 1992 deduction.  The petition in this case was filed on March 6, 1995.

OPINION

## I.  <u>Deductibility of Plan Payments</u>

Section 162(a) provides that a taxpayer may deduct all "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  Such expenses may include "a reasonable allowance for salaries or other compensation for personal services actually rendered". Sec. 162(a)(1); sec. 1.162-7(a), Income Tax Regs.  For such an expense to be deductible, two elements must be present:  (1) The amount must be reasonable, and (2) the expense must relate to compensation for services actually rendered.  <u>Elliotts, Inc. v. Commissioner</u>, 716 F.2d 1241, 1243 (9th Cir. 1983), revg. T.C. Memo. 1980-282.  Where there is evidence that an otherwise reasonable compensation payment contains a disguised dividend, we may expand our inquiry into the existence or nonexistence of compensatory intent.  <u>Id.</u> at 1244; see also <u>Ruf v. Commissioner</u>, T.C. Memo. 1993-81, affd. without published opinion 57 F.3d 1078 (9th Cir. 1995).

Numerous factors in the present case lead us to conclude that the plan allocations were not intended as compensation for services rendered.  First, in 1990, 1991, and 1992, petitioner paid Messrs. Blazick and Richter salaries and bonuses totaling

approximately 81 percent, 94 percent, and 92 percent, respectively, of petitioner's net income (i.e., calculated by adding back compensation). Such high percentages are consistent with the existence of disguised dividends. See Pacific Grains, Inc. v. Commissioner, 399 F.2d 603 (9th Cir. 1968), affg. T.C. Memo. 1967-7.

Second, petitioner has never declared or paid a dividend. While the U.S. Court of Appeals for the Ninth Circuit has indicated that this fact is not dispositive, Elliotts, Inc. v. Commissioner, supra at 1246, it is a relevant consideration, Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1324 (5th Cir. 1987), affg. T.C. Memo. 1985-267; Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 362 (9th Cir. 1974), affg. T.C. Memo. 1971-200. Mr. Rosi testified that in 1988 or 1989 he advised petitioner to pay dividends and that Messrs. Blazick and Richter's response discouraged him from offering such advice during the years in issue. Mr. Blazick, however, when asked why petitioner did not pay dividends, testified that dividends were not paid "Because Mr. Rosi prepared a procedure for us to follow and we did."

Third, Mr. Rosi's implementation of the plan had the effect of arbitrarily increasing allocations above the amounts the plan authorized. This occurred in 1990 and 1991 when Mr. Rosi utilized industry average gross profit margins lower than those published in the Survey, and in 1992 when Mr. Rosi reduced the

bad debts adjustment to Mr. Blazick's 1992 allocation.  Mr. Rosi offered no explanation for these apparent manipulations.

Finally, the most persuasive evidence of petitioner's lack of compensatory intent is the plan itself.  Consistent with the existence of disguised dividends, the plan applied only to petitioner's shareholders, Messrs. Blazick and Richter, and payments were expressly calculated with reference to their proportion of stock ownership.  See Elliotts, Inc. v. Commissioner, supra at 1246-1247 & nn. 4, 7.  Moreover, the plan does not use the value of services rendered as the basis for calculating the amount of compensation, but merely distributes excess profits to Messrs. Blazick and Richter.

Generally, incentive compensation plans are designed to increase the compensation to employees by some fraction of the benefit the corporation derives from the employees' efforts.  See Elliotts, Inc. v. Commissioner, supra at 1248 (stating that "Incentive payment plans are designed to encourage and compensate that extra effort and dedication which can be so valuable to a corporation."); cf. Kennedy v. Commissioner, 671 F.2d 167 (6th Cir. 1982), revg. 72 T.C. 793 (1979) (concerning incentive compensation equal to 52 percent of net profits); PMT, Inc. v. Commissioner, T.C. Memo. 1996-303 (concerning incentive compensation equal to 10 percent of the increase in sales over the previous year's sales).  As the benefit to the corporation increases, the compensation to the employee increases.

Dividends, on the other hand, are merely distributions of excess earnings to shareholders in proportion to their stock holdings.

Petitioner's plan provides that every dollar of gross profits in excess of the hypothetical gross profit goes directly to Messrs. Blazick and Richter while petitioner receives nothing. The allocations are measured by the amount of petitioner's excess gross profits and not by the value of Messrs. Blazick's and Richter's contributions to petitioner. We also note that the adjustments (i.e., relating to bad debts, inventory spoilage, production rerun costs, and inventory shortages) made to the allocations merely reduce the distributions to Messrs. Blazick and Richter without direct relation to the value of their services.

Accordingly, we conclude that the plan allocations were not made with compensatory intent and thus did not constitute compensation for services. As a result, we sustain respondent's determination for each year.

## II. Negligence Penalty

Section 6662(a) imposes an accuracy-related penalty in an amount equal to 20 percent of the portion of any underpayment to which the section applies. The section applies to, among other items, the portion of an underpayment attributable to negligence or disregard of rules or regulations. Sec. 6662(b)(1). Negligence has been defined as the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under

the circumstances.  Neely v. Commissioner, 85 T.C. 934, 947 (1985).  It includes the failure to make a reasonable attempt to comply with the Internal Revenue Code.  Sec. 6662(c).  In determining whether a corporation is liable for the negligence penalty, the acts of officers on behalf of the corporation are imputed to the corporation.  DiLeo v. Commissioner, 96 T.C. 858, 875 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Auerbach Shoe Co. v. Commissioner, 21 T.C. 191, 194 (1953), affd. 216 F.2d 693 (1st Cir. 1954); Ibabao Med. Corp. v. Commissioner, T.C. Memo. 1988-285.

We conclude that petitioner failed to exercise ordinary care.  The record establishes that the plan was both designed and manipulated to direct the flow of corporate earnings to Messrs. Blazick and Richter and to disguise such payments as compensation.

We have considered all other arguments made by the parties and found them to be either irrelevant or without merit.

To reflect the foregoing,

Decision will be entered

for respondent.