GEORGIA CROWN DISTRIBUTING CO., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Georgia Crown Distributing Co. v. Commissioner
Docket Nos. 20890-80, 20891-80, 18405-81.
United States Tax Court
T.C. Memo 1983-459; 1983 Tax Ct. Memo LEXIS 327; 46 T.C.M. (CCH) 959; T.C.M. (RIA) 83459; August 8, 1983. Richard Y. Bradley and Albert W. Stubbs, for the petitioners. Larry D. Anderson, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined the following deficiencies in petitioners' Federal income tax: Petitioner
Docket No
Year [2]
Deficiency
Georgia Crown
20890-80
1978
$75,432.03
Distributing Co.
1979
123,766.30
Donald M. Leebern,
20891-80
1978
36,014.00
Jr. and Francis
18405-81
1979
51,431.00
E. Leebern
After concessions, the only issue is whether amounts paid by petitioner Georgia Crown Distributing Co. to its President, Chairman of the Board, and Chief *328 Executive Officer, petitioner Donald M. Leebern, Jr., constituted reasonable compensation. FINDINGS OF FACT Some of the facts are stipulated and are found accordingly. Petitioner, Georgia Crown Distributing Co. (Georgia Crown) is a Georgia corporation having its principal place of business in Columbus, Ga. Petitioners, Donald M. Leebern, Jr. and Francis E. Leebern, resided in Columbus, Ga., when they filed their petitions herein. During the years in issue, Georgia Crown was engaged in the wholesale distribution of alcoholic beveraged in the State of Georgia. It is now a multi-state distributor of these beverages. It was founded and incorporated in 1949 by Donald M. Leebern, Sr., father of petitioner herein. Donald, Sr. died in 1957 as 100 percent shareholder of Georgia Crown. Pursuant to his Last Will and Testament, he devised all the stock of the company to the First National Bank of Columbus, Ga., to hold in trust one-half for the benefit of his surviving spouse and one-half for the benefit of his children in equal shares. At the time of his father's death, petitioner Donald, Jr. was 19 years old (hereafter petitioner Donald Leebern, Jr. will be referred to simply *329 as Leebern). Leebern joined Georgia Crown as a salesman upon his graduation from the University of Georgia in 1960. He became general manager in 1961 and president in 1963. At the time Leebern became president, Georgia Crown served a small metropolitan market in the Columbus and Albany, Ga., area. Soon thereafter, Georgia Crown embarked on an ambitious program of expansion. In 1966, Leebern Distributors, Inc., a corporation related to Georgia Crown, was organized to engage in the wholesale distribution of beer in the Columbus area, and in 1968, the Georgia Crown Distributing Company of Atlanta, Inc. (Georgia Crown of Atlanta) was organized to acquire the business of Atlanta Crown Distributing Co., a much larger wholesale distributor in the Atlanta area. The acquisition of the Atlanta company was completed in 1976 with the merger of Georgia Crown, Georgia Crown of Atlanta, and Leebern Distributors, Inc.Georgia Crown is the surviving corporation. Prior to and after the merger, the stock of the three participating corporations was held as follows: Before Merger
After Merger
GC of Atlanta
Leebern Dist.
GC
GC
Shareholder [3]
Petitioner Donald
75%
4.6%
25%
53.125%
M. Leebern, Jr.
Fate D. Leebern
0%
4.6%
25%
15.625%
Robert D. Leebern
0%
4.6%
25%
15.625%
William D. Leebern
25%
0%
25%
15.625%
Georgia Crown
0%
86.2%
*330 During the relevant period, Georgia Crown enjoyed remarkable success, and during the years in issue, it clearly outperformed the wholesale liquor industry both nationally and in Georgia. The growth of Georgia Crown in sales, net income before taxes, and shareholder's equity is reflected in the following table: TAXABLE YEARS [4]
NET INCOME
SHAREHOLDERS
ENDED IN
NET SALES
BEFORE TAXES
EQUITY
1964
$3,164,460
$122,735
$581,515
1965
3,325,002
99,197
628,459
1966
4,029,850
96,104
632,580
1967
5,181,397
128,146
696,784
1968
5,950,055
74,078
742,809
1969
11,305,748
231,836
876,327
1970
18,671,874
181,681
966,029
1971
19,410,271
203,571
1,071,025
1972
21,151,761
202,757
1,235,053
1973
24,604,808
345,388
1,331,982
1974
26,900,408
203,075
1,340,443
1975
28,157,666
482,088
1,489,555
1976
29,743,788
268,941
1,591,583
1977
34,486,677
783,738
1,707,450
1978
41,877,313
2,440,373
2,915,045
1979
45,354,824
3,152,087
4,303,581
*331 The remarkable performance of Georgia Crown is primarily attributable to the unique capabilities and outstanding performance of Leebern. He was in total control of all company operations. He decided all policy matters, made all purchasing and marketing decisions, developed the sales organizations, hired and fired all employees, set employee salaries, and dealt with Federal and state regulatory people. At the time Leebern first became president in 1963, Georgia Crown's annual sales were in the range of 3 million dollars. By 1979 annual sales exceeded 45 million dollars. Leebern was also very active in civic and trade associations. He served on various committees and was director of the Wine and Spirits Wholesalers of America, Inc., (WSWA), the national association of beverage alcohol wholesalers. He has also been treasurer, secretary, and vice-president of that organization. Twice he served as president of that organization's chapter in the State of Georgia. He was a winner of the Time Magazine Distinguished Wholesaler Award. He was also a member of the First Council of Seagram's Distributors, an advisory group of approximately 10 of Seagram's distributors, and a past president *332 of the Seagram's Family Association, the national association of Seagram's distributors. From 1966 through and including the years in issue, Georgia Crown adopted a policy of compensating Leebern with an annual salary plus a bonus equal to a percentage of the company's net profits before taxes. [5] The bonus was set shortly after commencement of each fiscal year by the Board of Directors, and the amount was computed shortly before the end of each fiscal year by multiplying the estimated net profits by the applicable percentage. When the plan was adopted in 1966, the bonus was set at 20 percent. In 1976, the year of the merger, the bonus was reduced to 10 percent and remained at 10 percent through the years in issue. The reason for the reduction was that the company had been making big profits so they "brought it back down." In 1971, 1972, and 1973, the Board of Directors declared the 20 percent bonus for Leebern; however, no such bonus was paid for those years. In 1974 no bonus was paid or declared. The company made personal loans to Leebern during these years. For all other years, Leebern was paid his bonus. *333 During the years in issue, Leebern owned 53 percent of the stock of Georgia Crown. He was also the President, Chairman of the Board of Directors, and Chief Executive Officer. The remaining stock was held by Leebern's three younger brothers. One brother, Robert D. Leebern, was employed by Georgia Crown as Vice President and Secretary and received a salary of $60,660.60 and $63,736.46 in 1978 and 1979, respectively. The Board of Directors consisted of 8 people three of whom were Leebern and two of his brothers, Fate D. and Robert D. Leebern. For many years, Leebern personally guaranteed the long-term debt of Georgia Crown. That debt reached a high of $3,114,000 during the years in issue. Under a loan agreement with the bank, Georgia Crown was prohibited from paying dividends unless the bank waived the restriction. Since 1964 Georgia Crown has paid no dividends with the exception of 1979 when $87,615 in dividends was paid with the consent of the bank. From 1976 through 1978, Georgia Crown had over $750,000 in outstanding advances to its officer-shareholders of which a substantial amount was attributable to Leebern. In 1979 this outstanding balance was reduced to just below *334 $575,000. During 1978 and 1979, Georgia Crown employed over 200 people. The total compensation paid by Georgia Crown to its employees, including Leebern, remained a constant 7 percent of its net sales. Georgia Crown did not provide its employees with any type of deferred compensation plan such as stock options, profits sharing plans, or pension plans. Leebern was the only employee compensated with a net profits bonus. Georgia Crown compensated Leebern as follows: 1977
1978
1979
Base Salary [6]
$160,103.00
$160,104.32
$160,104.32
Bonus (10% of
80,000.00
300,000.00
350,000.00
estimated net profit
before tax)
Total
$240,103.00
$460,104.32
$510,104.32
Petitioner Georgia Crown deducted as compensation the amounts paid to Leebern. In his notices of deficiency, respondent determined any amount in excess of $260,820 for the taxable years 1978 and 1979 constituted unreasonable compensation. [7]
*335 OPINION Under section 162(a)(1), a deduction is allowable to a corporation for "a reasonable allowance for salaries or other compensation for personal services actually rendered." As President, Chief Executive Officer, and Chairman of the Board, Leebern received total compensation of $460,104.32 and $510,104.32 in 1978 and 1979, respectively. The issue is whether these amounts constituted reasonable compensation. In order to be deductible, compensation must be both reasonable in amount and in fact paid purely for services. Sec. 1.162-7(a), Income Tax Regs. The question is one of fact to be determined by the particular facts and circumstances of each case, Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. 564, 567 (1974), affd. 528 F. 2d 176 (10th Cir. 1975), and the burden of proof is on the taxpayer. Botany Mills v. United States,278 U.S. 282, 292 (1929). A rather comprehensive list of factors to *336 be considered is found in Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court. Although we discuss only those factors upon which we place the greatest reliance, our conclusion is the result of evaluating the entire situation in light of all the above factors.
In cases like this which involve a closely held corporation where the taxpayer is in control and where there is a history of nonpayment of dividends despite considerable earnings, careful scrutiny must be given to ensure that the corporation is not distributing dividends disguised as compensation. See Kennedy v. Commissioner,72 T.C. 793 (1979), revd. 671 F.2d 167 (6th Cir. 1982); Charles Schneider & Co. v. Commissioner,500 F.2d 148, 151 (8th Cir. 1974), affg. a Memorandum Opinion of this Court; Logan Lumber Co. v. Commissioner,365 F.2d 846, 851 (5th Cir. 1966), affg. on this issue a Memorandum Opinion of this Court; Capitol-Barg Dry Clean. Co. v. Commissioner,131 F.2d 712 (6th Cir. 1942). *337 However, when other evidence persuasively establishes the reasonableness of compensation on the basis of employment related criteria, a deduction will not be denied notwithstanding the presence of these factors. See Commercial Iron Works v. Commissioner,166 F.2d 221 (5th Cir. 1948), affg. a Memorandum Opinion of this Court, and United States v. Safety Engineering & Supply Co.,374 F.2d 885 (5th Cir. 1967). A critical factor to be considered is an employee's skill and qualifications, and where an employee's contribution is particularly impressive, compensation commensurate with such contribution is in order. See Kennedy v. Commissioner,671 F.2d 167 (6th Cir. 1982), revg. 72 T.C. 793 (1979); Home Interiors & Gifts, Inc. v. Commissioner,73 T.C. 1142 (1980); Boyd Construction Company v. United States,339 F.2d 620 (Ct. Cl. 1964); Roth Office Equipment Co. v. Gallagher,172 F.2d 452 (6th Cir. 1949); Ziegler Steel Service Corp. v. Commissioner.T.C. Memo. 1962-57. There is no question Georgia Crown demonstrated remarkable success, and there is likewise *338 no question that Leebern's contribution to that success was instrumental. Under his direction and leadership, Georgia Crown expanded and consistently increased its sales and profits. When Leebern first became president in 1963, Georgia Crown distributed a limited line of whiskeys and wines to a small metropolitan area in and around Columbus, Ga., and by 1978 and 1979, it distributed a full line of alcohol products throughout the State of Georgia. In 1963, Georgia Crown's annual sales were in the range of 3 million dollars and by 1979 its annual sales exceeded 45 million dollars. At all relevant times, Leebern was the active head of all company operations. He maintained offices in both Atlanta and Columbus and generally split the work week, often consisting of 7 days, between the two offices. He decided all corporate policy matters and provided the overall guidance for a highly profitable distributorship. He made all purchasing, pricing, and marketing decisions. He developed the sales organizations, hired and fired all employees, and set their salaries. He dealt with all Federal and state regulatory authorities. Needless to say, he worked very long hours. Leebern is also *339 recognized as a leader and an innovator in the industry. Georgia Crown was one of the first "red whiskey houses" to become a full-line distributor of not only whiskey but also domestic and imported beer, wine, mixes, cups, Perrier water, etc. [8] Leebern is also very active in civic and trade associations. He is a 21-year member of the Board of Directors of the WSWA, the national trade association of alcohol wholesalers, and has served on various committees and has held several offices of that organization. He received national recognition as the winner of the Time Magazine Distinguished Wholesaler Award. Perhaps Leebern's single most outstanding contribution is that, through his leadership for nearly two decades, Georgia Crown has established one of the finest reputations in the industry. Thus, Georgia Crown has developed and maintained strong relationships will both its suppliers and its retailers. It was Leebern's connections with Seagram's Distillers, for *340 instance, that first led to Georgia Crown's penetration of the Atlanta market and which eventually resulted in the acquisition of the much larger Atlanta distributorship.
Other facts indicate the amounts at issue herein were paid purely for compensation and without an eye to the distribution of earnings. The payments were made by Georgia Crown pursuant to its long standing policy of compensating its chief executive officer with a net profits bonus. The policy was instituted in 1966 and, with the exception of the period 1971-1974, was followed each year thereafter. Nothing changed with that policy in the years in issue, and Leebern's activities or responsibilities during these years did not change.The only difference was that the company made more money in these years and, under the bonus plan, Leebern's compensation increased accordingly. We note that prior to 1978 and 1979, respondent never challenged the amount of compensation paid Leebern. Moreover, reflecting a conscious effort to keep a limit on his compensation, in 1976 Georgia Crown reduced Leebern's bonus from 20 percent to 10 percent since Georgia Crown had been making big profits. [9]
*341 One factor which is indicative of a dividend distribution is if payments are made in proportion to stockholdings. Trinity Quarries, Inc. v. United States,679 F.2d 205 (11th Cir. 1982); Nor-Cal Adjusters, Inc. v. Commissioner,503 F.2d 359 (9th Cir. 1974), affg. a Memorandum Opinion of this Court. However, the payments herein were not pro-rata; Leebern was the only employee who received a net profits bonus. This supports petitioners' position the amounts were intended to be compensation for services rendered. Kennedy v. Commissioner,671 F.2d 167 (6th Cir. 1982), revg. 72 T.C. 793 (1979); Berkshire Oil Co. v. Commissioner,9 T.C. 903 (1947); Soabar v. Commissioner,7 T.C. 89 (1946). Respondent relies to a great extent on the opinion of his expert witness, Dr. David Bowering (Bowering), a former assistant professor at the University of Maryland and a consultant for the past five years. In a nutshell, Bowering allegedly compared Leebern's compensation as a chief executive officer of *342 Georgia Crown with the compensation of chief executive officers of companies in the same size category in terms of net sales. He used data from both the wholesale liquor industry and from the broad range of wholesale industries (since certain relevant data was not available from the wholesale liquor industry). Based on his analysis, Bowering, at the conclusion of his written report, estimated a "high end" reasonable compensation for the chief executive officer of Georgia Crown to be $269,020 and $363,109 in 1978 and 1979, respectively. [10]
Bowering's report is based on his view of what "comparable businesses are paying employees performing comparable services." Yet, he acknowledges the difficulty in obtaining reliable data concerning closely held corporations. Moreover, as pointed out by the Court during trial, there are serious defects in Bowering's methodology. First, the data used is based solely on unknown companies that *343 compare to Georgia Crown and only as to volume of net sales. Bowering flatly rejected profitability as a standard of comprison, yet it is not uncommon to compensate chief executive officers with a bonus based on the company's net profits. [11] Thus, the report fails to take into account one of the principal points upon which petitioners' case is based, namely, that Leebern's compensation was, in part, a function of the unparalleled growth in profits experienced by Georgia Crown during the years in issue. Second, the report was prepared before the trial in this case and before Bowering had a chance to hear the evidence. He based his opinion on "a laundry list of services that * * * are typically performed by a chief executive officer." Yet, after hearing the testimony, he agreed on cross-examination that the scope of Leebern's duties and activities are broader than the services performed by the typical chief executive officer. Thus, it is apparent that, in developing his opinion, Bowering did not have a true picture of Leebern's value, another crucial part of petitioner's case. [12]
*344 Respondent has no quarrel when the compensation figure remains in the $250,000 range, but he challenges it when, due solely to unusually profitable years, it rises to the $500,000 range. Essentially respondent's position is that despite the performance of Georgia Crown and despite any contribution Leebern may have made toward the improvement of that performance, the compensation figures at issues are too high. We cannot agree. Based on his nearly 20 years as the active head of Georgia Crown, his demonstrated ability to generate profits and, in general, his value to the company, we find the amounts paid Leebern, a high level executive, constituted reasonable compensation. Ascertainment of an executive's true worth to his company is difficult. Each company is unique in its own way, and there are generally no reliable comparables. A firm that is different or unusually managed must be examined on its own merits and by its own results before executive pay can be fairly determined. We do not herein purport to possess any rare insight into these matters, but we feel that what was paid under these circumstances was reasonable for the services rendered. For over 20 years, Leebern has *345 been the figurehead of Georgia Crown. He has turned a small local concern into a highly profitable regional distributor of assorted alcohol products. Leebern has never reduced his workload or his involvement in company affairs. In fact, he has consistently assumed an ever increasing load of responsibilities. Leebern's contribution to Georgia Crown's success is beyond question, and his compensation which is based in part on the company's net profits reflects that success. Section 162(a)(1) is not intended to be a substitute for what otherwise constitutes sound business judgment by denying a deduction for compensation which may be in excess of the norm, see Home Interiors & Gifts, Inc. v. Commissioner,73 T.C. 1142, 1162 (1980), and in our opinion, the amounts paid Leebern reflect a reasonable value for his services. [13]
To reflect concessions and the foregoing, Decision will be entered under Rule 155 in docket *346 No. 20890-80, and
Decision will be entered for petitioners in docket No. 20891-80 and docket No. 18405-81.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Donald M. Leebern, Jr. and Francis E. Leebern, docket No. 20891-80, and Donald M. Leebern, Jr. and Francis E. Leebern, docket No. 18405-81.↩
2. Petitioner Georgia Crown Distributing Co. computed its income on the basis of its fiscal year ending June 30.↩
3. Fate D. Leebern, Robert D. Leebern, and William D. Leebern are the younger brothers of petitioner Donald M. Leebern, Jr.↩
4. Prior to March 31, 1976, the taxable year of Georgia Crown of Atlanta ended on March 31, the taxable year of Leebern Distributors, Inc., ended on July 31, and the taxable year of Georgia Crown ended June 30. For purposes of this table, the taxable years ending in each calendar year have been consolidated.↩
5. At the time the bonus plan was adopted, 73 percent of the stock of Georgia Crown was held by the trust department of the First National Bank of Columbus, Ga., as trustee under the various trusts created by the Will of Donald M. Leebern, Sr., and 13 percent was held by Leebern.↩
6. The base salary consists of $150,000 annual salary plus $10,104.32 annual insurance premium paid by the company. The premium for 1977 was $10,103.00.↩
7. In addition respondent determined the unreasonable amounts represent unearned income in the form of dividends to petitioner Donald M. Leebern, Jr. Thus, he determined such amounts were not subject to the 50 percent maximum tax rate provided by sec. 1348. This related issue depends on the resolution of the reasonable compensation issue.↩
8. A "red whiskey house" refers to a distributor of whiskey who is generally limited to bourbons and blends. Until recent times, wine, beer, and accessories were not carried by distributors of distilled whiskey.↩
9. See Denison Poultry & Egg Co. v. United States,52 AFTR 2d 83↩-5148 (N.D. Tex. 1982), a recent case where the taxpayer, the president and controlling shareholder of a wholesale distributor of Coors beer, received compensation of $162,448 in 1977 based in part on a 20 percent net profits before taxes bonus.In finding the company's success was due to the taxpayer, the District Court held the entire amount constituted reasonable compensation.
10. Respondent does not concede any amounts greater than $260,820, the amounts determined in his notices of deficiency for 1978 and 1979, constituted reasonable compensation notwithstanding the "high end" reasonable amounts determined by his expert.↩
11. Indeed, numerous cases have found compensation figures of high executives reasonable when based on a percentage of the company's net profits. See e.g., Kennedy v. Commissioner,671 F.2d 167 (6th Cir. 1982), revg. 72 T.C. 793 (1979) (34 percent net profits bonus); Lewisville Investment Co. v. Commissioner,56 T.C. 770 (1971); Ziegler Steel Service Corp. v. Commissioner,T.C. Memo. 1962-57 (20 percent net profits bonus). See also Harolds Club v. Commissioner,340 F.2d 861 (9th Cir. 1965), affg. T.C. Memo. 1963-198↩ (where the Ninth Circuit Court of Appeals upheld this Court's determination that reasonable compensation could be based on 15 percent of the company's net income). 12. While we point out these defects in the report of respondent's expert, we do not imply any agreement with other points in the report or with his use of the data therein.↩
13. Our decision is not based on the fact that pursuant to its loan agreement with the bank, Georgia Crown was prohibited from distributing dividends.↩